**In re Valorie W. DAVENPORT, Debtor.**

**Ron S. Rainey, Plaintiff,**

**v.**

**Valorie W. Davenport, Defendant.**

**Bankruptcy No. 03–38089–11.
Adversary No. 04–3618.**

United States Bankruptcy Court,
S.D. Texas,
Houston Division.

Feb. 2, 2006.

---

Valorie W. Davenport, Davenport Legal Group, Houston, TX, pro se.

Aaron Keiter, The Keiter Law Firm, P.C., Houston, TX, for Debtor.

Susan J. Brandt, Nathan Sommers Jacobs, Hector Duran, Ellen Maresh Hickman, Office of U.S. Trustee, Houston, TX, for Trustee.

## MEMORANDUM OPINION

JEFF BOHM, Bankruptcy Judge.

### I. INTRODUCTION

This six-day adversary proceeding involves a dispute between two trial lawyers over contingent fees. The plaintiff, Ron S. Rainey (Rainey), was an associate at the Davenport Law Firm, a small civil litigation plaintiff's boutique solely owned by Valorie W. Davenport, the debtor in this Chapter 7 case (the Debtor). The Debtor lured Rainey away from another firm by offering him a higher salary and assigning to him a percentage of the contingent fees to which the Davenport Law Firm was entitled in certain litigation. Both the testimony at trial and various documents admitted into the record refer to this litigation as "the Brio/DOP Litigation." At trial, the Debtor described this litigation as follows:

The Brio DOP site is an old—basically it was portrayed as a site down in the

Friendswood area that was supposed to, or allegedly reprocessed byproducts from various chemical plants, but really what it was, it was a toxic dumpsite. It had a lot of unlined pits and a lot of chemical producers took their waste down there under the guise of some of them selling them for reprocessing, but really what it was, was a way of getting

rid of their toxic waste and so it was the surrounding land was then developed for first-time home buyers and a elementary school was put in and the toxic waste seeped out into the community thereby causing injury to the—a lot of the children and the adults in the that area, causing a lot of litigation. [Transcript D1, p. 23, line 16 through p. 24, line 3].[1]

The defendants in this litigation were large corporations with deep pockets, including Monsanto Company, Atlantic Richfield Company, Chevron Chemical Company, Amoco Chemical Company, and Union Carbide Corporation. [Transcript, D1, p. 25, line 9 through p. 26, line 5]. Indeed, the "Brio/DOP" moniker stands for Brio Refining, Inc./Dixie Oil Producers. [Transcript D6, p. 244, lines 11–12]. In 1984, the Federal Government determined that hazardous substances present in the area endangered the residents and designated it as the "Brio Superfund Site". [Transcript D1, p. 24, line 20, through p. 25, line 3].

The Davenport Law Firm was one of several firms representing the plaintiffs in the Brio/DOP Litigation. As this litigation grew, the Debtor decided to recruit another attorney to join the Davenport Law Firm. That attorney was Rainey. [Transcript D1, p. 23, lines 4–9].

After Rainey moved to the Davenport Law Firm, the Debtor paid him the entire promised higher salary, but she failed to remit to him his full percentage of the contingent fees. When these fees were paid to the Debtor's firm, the Debtor, rather than allocating them proportionately to Rainey, spent some of the funds to which Rainey was entitled. Thereafter, Rainey

---

1. Throughout this Memorandum Opinion, there are citations to the transcript of the trial. "D1" means that the transcript is from the first day of the trial, "D2" refers to the transcript from the second day of the trial, and this method of abbreviation is used for all six days of the trial. References are also made to various exhibits introduced by the Debtor and Rainey at trial.

sued the Debtor in state court. Rainey and the Debtor achieved a settlement in mediation, and the suit was dismissed. However, the Debtor then defaulted under the terms of the mediated settlement agreement, prompting Rainey to file a second lawsuit. In this second suit, the Court granted summary judgment for Rainey. Thereafter, the Debtor filed a voluntary Chapter 11 petition, and Rainey filed a proof of claim based on the mediated settlement agreement and judgment from the second suit. Once the Debtor's case was converted to a Chapter 7 case, Rainey initiated this adversary proceeding by filing a complaint against the Debtor to determine dischargeability under 11 U.S.C. § 523(a)(4) or, alternatively, 11 U.S.C. § 523(a)(6).

Rainey seeks to prevent the discharge of his claim against the Debtor for spending a portion of the contingent fees that she owed to him. Rainey negotiated the amount of the claim at the mediation and subsequently reduced the claim to a judgment in the second suit. [Transcript D2, p. 213, lines 8–17]. Rainey bases his complaint against the Debtor on any one of the following four grounds: (1) fraud or defalcation while acting in a fiduciary capacity; (2) embezzlement; (3) larceny; or (4) willful and malicious injury by the Debtor to Rainey. This Court does not believe that the Debtor was in a fiduciary relationship with Rainey, nor does this Court believe that the Debtor committed larceny; therefore, Rainey's complaint fails with respect to these two grounds. Conversely, this Court holds that the Debtor embezzled the funds belonging to Rainey. Accordingly, Rainey's claim is nondischargeable. Alternatively, and in addition to the Court's holding on embezzlement, this Court holds

that the Debtor's spending of the monies belonging to Rainey constitutes willful and malicious injury by the Debtor to Rainey. The purpose of this Memorandum Opinion is to discuss how this Court has arrived at these holdings.

## II. FINDINGS OF FACT[2]

1. The Debtor graduated from the University of Houston Law Center and has been a licensed attorney in the State of Texas since 1984. [Transcript D1, p. 20, line 21 through p. 21, line 1; Transcript D2, p. 139, lines 4–11].

2. After graduating from law school, the Debtor served as a briefing attorney for the Texas Court of Appeals, First District. Thereafter, for a few years, she worked for certain plaintiff's firms in Houston. In 1989, the Debtor founded her own firm with a civil litigation practice (the Davenport Law Firm or the Debtor's law firm). [Transcript D3, p. 140, lines 11–14]. The Debtor is the sole principal of the Davenport Law Firm. [Transcript D 1, p. 21, line 17 through p. 22, line 10; D6, p. 262, lines 6–18].

3. Soon after the Debtor started her own law firm, she was appointed as the attorney *ad litem* for approximately 200 children in the Brio/DOP Litigation. This appointment eventually led to her firm accepting representation of various plaintiffs in the Brio/DOP Litigation. [Transcript D3, p. 141, line 21 through p. 144, line 9].

4. Rainey has an undergraduate degree in accounting as well as a mas-

**2.** This Court makes additional findings of fact in Sections III and IV of this Memorandum

Opinion.

ters in taxation from the University of Texas–Arlington. He worked at an accounting firm for a few years before obtaining a law degree from the University of Houston Law Center in 1988; however, he does not hold a CPA. After graduating from law school, he began work as an associate at the law firm of Haynes and Fullenwider; and when that firm disbanded, he worked for the Law Offices of Richard Haynes for approximately seven years. Thereafter, he became an associate attorney at the Davenport Law Firm. [Transcript D1, p. 247, line 3 through p. 248, line 1; Transcript D2, p. 236, lines 2–3; Rainey's Exhibit # 42].

5. The Debtor first met Rainey in 1992 or 1993 when he was working for the Law Offices of Richard Haynes. [Transcript D1, p. 22, line 23 through p. 23, line 1].

6. When the Debtor first met Rainey, the Debtor believed that Rainey could help her firm because he "was a good administrative attorney and good second chair for Mr. Haynes and I thought he would be good in the practice from that perspective." [Transcript D1, p. 23, lines 4–9; see also Debtor's Exhibit # 64, p. 2, lines 2–5].

7. In order to persuade Rainey to leave the Law Offices of Richard Haynes and move to her firm, the Debtor orally promised Rainey: (a) a salary increase from $50,000.00 to $90,000.00; and (b) an initial assignment of 10% of the fees which the Davenport Firm earned from all Brio/DOP Litigation, with the percentage to increase over a period of time. [Transcript D1, p. 27, line 22 through p. 28, line 9; Transcript D1,

p. 249, line 16 through p. 250, line 17].

8. Neither party reduced these promises to writing at the time the Debtor made them. [Transcript D1, p. 31, lines 19–22; Transcript D1, p. 251, lines 7–10]. However, Rainey in reliance on these promises, resigned from the Law Offices of Richard Haynes and took an associate position at the Davenport Law Firm in October of 1993. [Transcript D1, p. 250, lines 18–20]. Rainey was an associate at the Debtor's law firm during his entire tenure there. [Transcript D2, p. 271, lines 9–11; Transcript D4, p. 19, lines 17–19]. The Debtor considered him an employee at all times. [Transcript D6, p. 262, lines 18–20].

9. Once Rainey's employment started at the Davenport Law Firm, he worked on various cases, including the Brio/DOP Litigation. The Debtor never removed Rainey from working on the Brio/DOP Litigation, which was the biggest case in her firm. [Transcript D1, p. 251, pages 2–6; p. 251, line 22 through p. 252, line 2; Transcript D4, p. 19, lines 17–19].

10. On June 15, 1995, the Debtor and John M. O'Quinn, on behalf of his law firm (O'Quinn), entered into an agreement whereby, among other terms, O'Quinn assumed full responsibility for certain claims comprising a portion of the Brio/DOP Litigation; specifically, the Aguilar, Melendez, and Le claims (hereinafter referred to as the O'Quinn/Brio Litigation, which involved a total representation of approximately 26 plaintiffs). According to this agreement, O'Quinn and the Debtor's law firm would share the net attorneys' fees received from these

cases on a 50%/50% basis. Further, O'Quinn was to have no involvement in or responsibility for any other case comprising the Brio/DOP Litigation, including but not limited to the so-called Allen case. [Rainey's Exhibit # 3; Debtor's Exhibit # 25].

11. On July 12, 1995, the Debtor and John E. Williams, on behalf of his law firm, Williams, Bailey and Westner (Williams), entered in an agreement whereby, among other terms, except for the O'Quinn/Brio Litigation, Williams would partner with the Davenport Law Firm to prosecute all cases, existing or acquired in the future, that related to the Brio/DOP site (hereinafter referred to as the Williams/ Brio Litigation, which involved a total representation of approximately 1,200 plaintiffs). According to this agreement, Williams and the Davenport Law Firm would share the net attorneys' fees received from these cases on a 50%/50% basis and, in the interim, Williams would advance the Davenport Law Firm $65,000 each month to cover the expenses of the Debtor's firm's expenses. [Rainey's Exhibit # 89].

12. On March 6, 1996, the agreement between the Debtor and Williams was modified so that Williams would no longer be remitting to the Debtor's firm the monthly sum of $65,000.00. [Debtor's Exhibits # 27 and 28; Rainey's Exhibit # 63].

13. In April of 1996, the Davenport Law Firm filed four lawsuits—two in the United States District Court for the Southern District of Texas, Galveston Division; and two in Harris County District Court (hereinafter referred to as the Davenport/Brio Litigation)—which comprised part of the Brio/DOP Litigation. [Transcript D1, p. 179, line 21 through p. 186, line 23; Rainey's Exhibits # 6 and 7].

14. On July 29, 1996, the Debtor sent a letter to an employee of Williams to request that office space be made available for certain employees of the Davenport Law Firm, including Rainey. In this letter, the Debtor represented that Rainey "has a percentage partnership interest in the Brio recovery." [Transcript D1, p. 137, line 18 through p. 137, line 13; Rainey's Exhibit # 2].

15. On November 1, 1996, the Debtor received $162,514.03 from O'Quinn. This amount represented a payment of a small portion of the fees earned by the Davenport Law Firm from the O'Quinn/Brio Litigation. Subsequently, O'Quinn provided to the Debtor a chart entitled "Settlement Reconciliation," which reflected that the total amount of fees due to the Debtor's firm from the settlement of the O'Quinn/Brio Litigation was $1,165,749.39. [Rainey's Exhibit # 4; Debtor's Exhibit # 26]. This chart also reflected that O'Quinn deducted certain amounts from this figure, including $331,780.36. The amount of $331,780.36 was deducted to pay O'Quinn principal and interest on a loan that O'Quinn had extended to the Debtor for the purchase of her house on Sunset Blvd. in Houston, Texas. [Rainey's Exhibits # 4, 5 and 64; Debtor's Exhibit # 26; Transcript D1, p. 145, lines 8–21].[3]

---

3. It is unclear whether the loan was from the O'Quinn Law Firm or Mr. O'Quinn, in his

Rainey does not know why O'Quinn made all of the deductions that he did, as the discussions regarding these deductions occurred between O'Quinn and the Debtor outside of Rainey's presence. [Transcript D2, p. 236, line 12 through p. 239, line 4]. The Debtor has never provided Rainey with a list of the expenses attributable to the O'Quinn/Brio Litigation. [Transcript D2, p. 293, lines 4–7].

16. Because Rainey worked on the Brio/DOP Litigation, he had knowledge about the status of the various cases. In 1996, he knew that the O'Quinn/Brio Litigation had settled, and he was expecting to receive his promised percentage of the fees paid to the Davenport Law Firm. At this time, he believed his percentage was 15%. The Davenport Law Firm's fees from the O'Quinn/Brio Litigation totaled $1,165,749.39, and therefore Rainey was expecting to receive approximately $170,000.00. Yet, the Debtor paid him nothing. [Transcript D1, p. 252, line 3 through p. 253, line 24].

17. Upset about not receiving his assigned percentage share of the fee from the O'Quinn/Brio Litigation, Rainey met with the Debtor to express his displeasure and obtain an explanation. The Debtor told him that O'Quinn was not going to immediately pay her the entire fee owed to the Davenport Law Firm, but only a portion of the fee, and that she needed all the funds that O'Quinn was going to be paying her at the moment. [Transcript D1, p. 253, line 25 through p. 254, line 8].

18. At or about the time that Rainey expressed his disenchantment to the Debtor about the fact that he would not be receiving any portion of the fee from the O'Quinn/Brio Litigation, the Debtor wrote him a letter on August 14, 1996. This letter requested Rainey to set forth his understanding of the terms of his employment when he came to work at the Davenport Law Firm in October of 1993. In this letter, the Debtor did not set forth what she believed to be the terms of Rainey's employment. [Transcript D1, page 255, line 24 through p. 256, line 19; Rainey's Exhibit # 66; Debtor's Exhibit # 31].

19. On September 20, 1996, Rainey responded to the Debtor's August 14, 1996 letter. His response was very specific about the terms of the oral agreement. He wrote as follows:

My scope and responsibility for the work/management of the Brio files was not specifically discussed. However it was specifically discussed that O'Quinn and his office would play a major role in these areas.

As it relates to bonuses, I expect no Brio bonus in that I have an interest in the outcome of the litigation. In regard to non-Brio litigation, my bonus would be within your sole discretion and, as you put it, out of the goodness of your heart.

Brio was tied directly to our agreement and my decision to come to your firm. As it relates to the Brio litigation, we specifically discussed and I was to receive a percentage interest in the outcome of **all** Brio cases, those presently retained and/or filed and all cases later acquired.[1] The percentage interest varied depending upon time within which the cases were resolved and/or tried. I

individual capacity.

was to receive, up front, a 10% interest in the outcome of all Brio litigation.[2] I was to receive an additional 5% interest for each year in excess of two years. Thus, at the end of three years employment I would have a 15% interest, at the end of 4 years of employment, I would have a 20% interest etc. This percentage was to be allocated over time. For example if the litigation took 3 and ½ years I would have a 17½% interest. The interest was a percentage of the outcome less case related expenses. This interest was to be a present vested assignment of the outcome of the litigation with the passage of time and services and thus succeed to my wife and/or kids should anything happen to me. There was no dollar floor or ceiling on the interest other than that which would be set by the percentage of the outcome less case related expenses. The interest was to be paid on a case by case basis. I do not remember discussing draws as they relate to my interest in the Brio litigation.

Our agreement was outcome less case related expenses. This did not include such items such as salaries, rent, or any overhead. It was case expenses as they relate to that specific case. At that time the only expenses that I foresaw that might be deductible from the fees generated were those that the court required in relation to any minors that we represented, for all other case related expenses would be reimbursed by the clients. I did not foresee this definition of "after expenses" to change. [Transcript D1, p. 255, line 24 through p. 256, line 19; Rainey's Exhibit # 67; Debtor's Exhibit # 33].

---

1. We specifically discussed the filing of new suits including but not limited to the Weber plaintiffs.

2. Although it was not discussed I did not and do not expect an interest in the ad litem litigation.

20. As a result of the Debtor failing to pay Rainey any of his percentage share from the fee earned by the Debtor's firm in the O'Quinn/Brio Litigation, and as a result of the exchange of letters between the Debtor and Rainey referred to above, the Debtor and Rainey signed the only written agreement describing the specific terms and conditions under which Rainey would receive a percentage of any contingent fee in the Brio/DOP Litigation to which the Davenport Law firm was entitled. This written agreement (the Agreement), which the Debtor and Rainey executed at the Davenport Law Firm on November 26, 1996, [Transcript D2, p. 284, lines 3–9], reads as follows:

This document shall hereby memorialize a prior assignment to Ron Rainey, as a condition of Ron Rainey accepting employment with the Law Offices of Valorie W. Davenport in October of 1993, of an amount equal to 15% (fifteen percent), less expenses directly related to the Brio/DOP litigation, of the interest of The Law Offices of Valorie W. Davenport in the outcome of any and all Brio/DOP litigation of which the Law Office of Valorie W. Davenport had an interest in as of October 3, 1993 and/or acquired an interest in prior to the date below. Ron Rainey is also hereby assigned the same percentage interest in any and all Brio/DOP litigation of which The Law Offices of Valorie W. Davenport may acquire subsequent to the date below as long as Ron Rainey works on and is associated with this subsequently acquired litigation. This assignment includes the Aguilar, Le and Melendez lawsuits previously settled, but does not

include any prior ad litem disputes with the 151st court. [Transcript D1, p. 25, line 8 through p. 37, line 9, Rainey's Exhibit # 1; Debtor's Exhibit # 34].

21. Rainey relied on the Agreement, and on his future receipt of funds generated as each case in the Brio/DOP Litigation settled, in order to continue working at the Davenport Law Firm; and if the Debtor had refused to execute the Agreement, Rainey would have resigned from her firm. [Transcript D1, p. 252, line 3 through p. 255, line 23]. The Debtor has never revoked the Agreement in writing. [Transcript D1, p. 39, lines 22–24].

22. After the Debtor and Rainey signed the Agreement, Rainey continued to work on the Brio/DOP Litigation. [Transcript D1, p. 257, pages 24–25].

23. On May 23, 1997, the attorney for some of the defendants in the Williams/Brio Litigation wrote a letter to Williams discussing amounts to be paid to certain plaintiffs in this litigation as part of a settlement. [Rainey's Exhibit # 9].

24. On June 17, 1997, the attorney for Monsanto Company, one of the defendants in the Williams/Brio Litigation, wrote to Williams, the Debtor, and the other attorney representing the plaintiffs, setting forth that Monsanto would pay $10 million to settle all claims against the company. [Rainey's Exhibit # 10].

25. In September 1997, as a result of the settlement of the Williams/Brio Litigation, the settlement proceeds were paid to Williams. [Transcript D2, p. 244, lines 13–23; p. 276, lines 6–23]. At approximately that same time, Williams distributed a disbursement sheet showing that the Davenport Law Firm's share of the fee was $4,577,929.04. [Transcript D 1, p. 261, line 18 through p. 265, line 17; Rainey's Exhibit # 11].

26. On September 12, 1997, the Debtor received a $500,000.00 check from Williams. This money was due to the Davenport Law Firm as part of its contingency fee related to the Williams/Brio Litigation. The Debtor did not deposit the check into her firm's trust account, an IOLTA account, or in an escrow account. Rather, she deposited this check into her firm's operating account. [Transcript D1, p. 71, line 5 through p. 72, line 12; p. 176, lines 13–21; Rainey's Exhibits # 13 and # 15, p. V00027]. From the $500,000.00, the Debtor then paid Rainey the sum of $50,000.00. [Debtor's Exhibit # 38; Transcript D2, p. 272, lines 18–24].

27. On September 15, 1997, Rainey resigned from the Davenport Law Firm. [Transcript D1, p. 26, lines 14–16; Rainey's Exhibit # 56]. Once he resigned, he ceased working on the Brio/DOP Litigation. [Transcript D2, p. 271, lines 19–21].

28. On September 22, 1997, the Debtor paid Rainey another $50,000.00. [Debtor's Exhibit # 37; Debtor's Exhibit # 37, Transcript D2, p. 272, lines 18–24].

29. On September 23, 1997, the Debtor received a $2,245,447.34 check from Williams. Once again, this money was due to the Davenport Law Firm as part of its contingent fee related to the Williams/Brio Litigation. The Debtor did not deposit this check into a trust account because, as she testified: "I don't think I ever considered putting it

[the check] in my trust account. It was just my fees." Again, the Debtor deposited the funds into her firm's operating account. [Transcript D1, p. 73, line 3 through p. 79, line 1; p. 176, lines 13–21; Rainey's Exhibit # 14].

30. Although the disbursement sheet from Williams showed that the Davenport Law Firm's share of the fee from the Williams Litigation was $4,577,929.09, Williams made deductions such that the actual amount of money remitted to the Debtor's firm was $2,745,447.39. Rainey does not know why Williams made all of the deductions that he did, as the discussions regarding these deductions occurred between Williams and the Debtor outside of Rainey's presence. [Transcript D2, p. 236, line 12 through p. 239, line 4]. The Debtor has never provided to Rainey a list of the expenses attributable to the Williams/Brio Litigation. [Transcript D2, p. 243, lines 4–7].

31. On September 24, 1997, the Debtor paid Rainey the amount of $300,000.00 [Transcript D1, p 76, line 22 through p. 77, line 12; Rainey's Exhibit # 15; Debtor's Exhibit # 39], and told him that she would meet with him in two weeks to resolve the issue regarding how much she still owed him pursuant to the Agreement. [Debtor's Exhibit # 43].

32. On October 9, 1997, Rainey and the Debtor had a face-to-face meeting to discuss what amount the Debtor still owed to Rainey. The Debtor informed Rainey that she still did not have all of the expenses available in order to determine what was owed to Rainey. She promised Rainey that she would meet with him and resolve the issue before she departed for her vacation in Hawaii on October 15, 1997. [Debtor's Exhibit # 43].

33. On October 14, 1997, Rainey spoke with Gloria, an employee at the Davenport Law Firm, who told him that the Debtor would not be able to meet with him before taking her two week trip to Hawaii. [Debtor's Exhibit # 43].

34. On October 14, 1997, after he spoke with Gloria, Rainey wrote a letter to the Debtor stating, in part, the following:

On September 24, 1997, you promised me that we would meet within two weeks and resolve the fees due and owing me as a result of the Brio settlements. On Thursday, October 9, 1997, I met with you and at that time you again explained you still did not have all of the expenses available but promised we would meet and resolve the matter before you left for Hawaii on the 15th of October. I just spoke to Gloria and she has now informed me that you will not be able to meet before your two-week trip to Hawaii.

Valorie, this is not fair and in keeping with your word . . .

At trial, the Debtor conceded that she did not meet with Rainey to resolve the fee dispute within the above-referenced two weeks. [Transcript D4, p. 29, line 7 through p. 30, line 5; Transcript D4, p. 37, lines 5–9]. In the October 14 letter, Rainey provided the Debtor with his estimate of what he believed she owed him. His estimate was $325,000.00. [Debtor's Exhibit # 43; Rainey's Exhibit # 49].

35. On October 15, 1997, the Debtor departed for a two week vacation in

Hawaii. [Transcript D1, p. 26, lines 9–16; Debtor's Exhibit # 43].

36. When Rainey left the Davenport Law Firm, he told the Debtor that he was not going to work any further on the Davenport/Brio Litigation. [Transcript D1, p. 187, lines 13–17].

37. After Rainey left, he went to work at the law firm of Fox, Rainey and Buttram. The Debtor attempted to convince this firm to take over the Davenport/Brio Litigation, but this firm declined to do so. [Transcript D1, p. 189, line 13 through p. 190, line 24]. The Rice firm took over the Davenport/Brio Litigation, and eventually, judgment was rendered against the plaintiffs in the cases comprising this litigation. The Davenport Law Firm received no fee for the Davenport/Brio Litigation, and therefore the Debtor and Rainey have no fee dispute relating to this particular litigation. [Transcript D1, p. 191, line 6 through p. 193, line 2].

38. Throughout 1997, the Debtor made monthly payments of $2,835.52 to Greenspoint Mortgage, the holder of a lien on the Debtor's house, out of her firm's operating account. She also used her firm's operating account to pay for her two automobiles. [Transcript D1, p. 95, line 6 through p. 98, line 4; Rainey's Exhibit # 21]. Additionally, despite testifying that she did not expect Rainey to be charged for the rent that her firm pays, she conceded that "Well I did use—when we got that fee in, I did use some of these monies to pay expenses on our overall office space." [Transcript D3, p. 165, line 20 through p. 166, line 5; p. 187, line 24 through p. 188, line 4]. Further, the Debtor

testified that when her firm received the fee from the Williams/Brio Litigation in the fall of 1997, she used $250,000.00 to pay off a firm loan, the proceeds of which she had used to pay the firm's operating expenses. [Transcript D3, p. 178, line 25 through p. 179, line 25; Rainey's Exhibit # 21, Bates Stamp # V00156].

39. The monthly expenses of the Debtor's law firm during the time period that the firm was prosecuting the Brio/DOP Litigation was between $85,000.00—$95,000.00. [Transcript D4, p. 30, lines 12–15]. Moreover, during this same period, the Debtor had personal expenses between $27,000.00—$30,000.00 per month, including a monthly house payment of approximately $5,000.00. [Transcript D4, p. 30, lines 19–25]. The Debtor has admitted using the fees from the Brio/DOP Litigation to pay personal expenses [Transcript D4, p. 36, lines 7–8]; and she has made a judicial admission that she received these fees knowing that Rainey had a legal interest in them. [Transcript D1, p. 16, lines 23–25].

40. On January 12, 1998, the Debtor wrote a letter to Rainey discussing, among other issues, her thoughts about the sums due to Rainey under the Agreement. The Debtor conceded that:

"The Brio cases took nearly four years to settle and eventually brought in far less money than either of us expected. During what turned out to be a long four years, as more of the firm resources had to be directed toward Brio, and you as well as much of our staff—at least in the beginning—had to move to Williams and Bailey, we found ourselves in a position where Brio was draining us

and we weren't getting any new infusion of capital because we could not aggressively work and turn our existing cases. In order to pay overhead, I had to personally turn over $1,500,000.00 in order to keep the firm alive." [Rainey's Exhibit # 84].

This information is shared with you in order to reemphasize that Brio did not make the profit either of us expected. I also hope it will show you that despite what, if anything else, you receive now, you have made a sizable and by most people's standards "great" profit on top of a healthy salary. On the other hand, I have and will continue to absorb a stagging (sp) loss. In light of these facts my feeling again is that we are more than right with each other. [Rainey's Exhibit # 84].

41. On January 16, 1998, Rainey responded to the Debtor's letter of January 12, 1998. In this letter, Rainey maintained that he was still owed $325,000.00—the same figure set forth in his October 14, 1997, letter—and he emphasized to the Debtor that the poorer-than-expected outcome of the Brio/DOP Litigation was not a basis for the Debtor to change the terms of the Agreement. Specifically, Rainey wrote:

I agree that Brio did not settle for what we had expected. However, I do not agree that the fact that Brio did not settle for what you expected provides a means by which you can modify our agreement. If you will remember, I forewent other opportunities when I accepted employment with your firm. I did so based on the Brio litigation. Two years later we sat down and memorialized our agreement relating to Brio. It is apparent that you are now unhappy with that agreement and that you believe the terms are unclear. It seems the major

issue in your mind is what are "expenses directly related to the Brio/DOP litigation"? We discussed this matter prior to the signing of the agreement and if you will refer to my letter of September 20, 1996, you will see that my percentage would not be reduced for expenses such as salaries, rent, or any overhead. In fact, it was originally worded as "related expenses" and then changed to "expenses *directly* related to the Brio/DOP litigation." I have never agreed to fund the operation of your firm. [Transcript D2, p. 204, line 8 through 205, line 21; Rainey's Exhibit # 68; Debtor's Exhibits # 63].

42. Rainey repeatedly asked the Debtor for an accounting of expenses so that a specific calculation of the amount owed to Rainey under the Agreement could be done. The Debtor never provided him with any accounting. [Transcript D2, p. 210, line 13 through p. 212, line 18; p. 242, line 18 through p. 243, line 13].

43. On March 26, 1998, Rainey sent a letter to Williams stating the following:

As you are aware, through my employment with The Law Office of Valorie Davenport, I received an interest in the outcome of the Brio Litigation. To date I am still due and owing in excess of $375,000.00 of Brio funds. I have tried to meet with Valorie to resolve our differences but all attempts have failed. Therefore, I hereby assert my interest in the Brio funds maintained by your office on behalf of the Law Offices of Valorie Davenport. I request that you retain $400,000.00 ($375,000.00 plus reasonable attorney fees in the amount of $25,000.00) of those funds and that they not be distributed without prior approval of both Valorie and myself. If you do

desire I will file an interpleader. However, as it stands now, I am relying on our earlier correspondence wherein you agreed to protect my interest. [Rainey's Exhibit # 59].

44. On April 27, 1998, Rainey filed suit against the Debtor in the District Court of Harris County, Texas. The style of the suit was cause no. 98–20066, 269th Judicial District, *Ron Rainey v. Valorie Davenport, Individually, and doing business as the Law Offices of Valorie W. Davenport* (the 1998 Lawsuit). The suit alleged that the Debtor breached the Agreement. Rainey requested that the Court award him damages. The Debtor filed an answer to Rainey's petition, and thereafter, Rainey attempted to conduct discovery. [Transcript D1, p. 85, line 23 through p. 90, line 2; Debtor's Exhibit # 22; Rainey's Exhibits # 16, 17, 18, 19, and 20].

45. On July 30, 1998, the Debtor received $469,619.28 from the Williams law firm. [Transcript D3, p. 235, lines 11–17; Rainey's Exhibit # 15, p. 27 marked as V00027]. This payment was due to the Davenport Law Firm as part of its contingent fee related to the Williams/Brio Litigation. The Debtor deposited this check into her firm's operating account and did not deposit the money into an IOLTA account. Moreover, when she received this money, the Debtor neither notified Rainey of her receipt of these funds nor paid him any portion of these funds. [Transcript D1, p. 81, line 11 through p. 84, line 22].

46. On February 10, 1999, Rainey's attorney in the 1998 Lawsuit wrote a letter to the Debtor's attorney in that suit. The purpose of this letter was to educate the Debtor's attorney about Rainey's position—i.e. that the Debtor still owed him a portion of the fees generated by the Brio/DOP Litigation—in order to assist the Debtor's attorney in evaluating the Debtor's position. With respect to the meaning of the phrase "less expenses directly related to the Brio/DOP Litigation," three paragraphs in this letter address the issue:

On August 14, 1996, Valorie writes Ron requesting his understanding of what terms should be incorporated into the contract between them. The letter expressly asked Ron, "how do we define expenses?"

The next letter from Ron written September 20, 1996 Ron directly addressed the issue of expenses by stating, "Our agreement was outcome less case related expenses. This did not include such items as salaries, rent, or any overhead. It was case expenses as they relate to that specific case."

On November 26, 1996, Ron and Valorie both enter into a signed agreement regarding the Brio cases. The agreement specifically addresses the expenses to be subtracted from the gross fees received. Stated in the contract, Ron Rainey is to receive an amount equal to 15% of the fees generated in the Brio litigation *less expenses directly related* to the Brio/DOP litigation. Given the extent of discussion surrounding expenses and the negotiations prior to the final contract, it is clear what *expenses directly related* means and why directly was included in the final version of the contract. [Rainey's Exhibit # 71; Debtor's Exhibit # 29].

47. In the spring of 1999, the Debtor and Rainey began a mediation in an attempt to reach a settlement and avoid going to trial in the 1998

Lawsuit. On April 19, 1999, the Debtor wrote a letter to the mediator (the Honorable Frank C. Price) setting forth her thoughts about the issues related to the suit brought by Rainey against her.

In this letter to the mediator, the Debtor expressed her thoughts as to why she owed nothing more to Rainey:

Brio clearly took up the great majority of VWD's law firm's time and available resources during the time it was worked jointly (or for certain periods of time independently) by her office. If *Brio* is charged 50% of those overhead monies, RSR would owe her firm or, at best, if it were charged a far lower percentage, he would be entitled to receive nothing. As it stands now, he has been paid handsomely, endured none of the pain in keeping the case alive, and did not lose any capital investment or be placed in a position where he is still pay [sp] off old firm debt because the firm went in the hole handling the case. His credit was not destroyed because of the blow that this case dealt, not [sp] does he face future financial problems directly related to Brio.

As far as VWD is concerned, RSR has been grossly over-paid and his skills highly over-rated. Many others who worked directly with RSR are ready to attest to his lack of competence, commitment and effective contribution to the ultimate result (albeit less that [sic] all had hoped) in the Brio case. His lack of commitment to the clients can and will, if necessary, clearly be shown by what now has happened in Galveston. Finally, as far as any benefit or income (beyond Brio) that he supposedly brought to VWD's firm, the numbers speak for themselves. In the entire time he worked at the Law Offices of VWD,

RSR's total, combined figure for *all four years* amount to less than **$25K** in fees.

It is VWD's position that RSR is not entitled to one more dime from her firm, via Brio or otherwise. I guess this makes the potential for an amicable settlement look pretty bleak, doesn't it? [Debtor's Exhibit # 64].

48. In May of 1999, mediation took place between the Debtor and Rainey, and their respective counsel. On May 21, 1999, the Debtor sent Rainey a letter outlining terms of the settlement. [Debtors's Exhibit # 65.]

49. On or about November 20, 1999, after further mediation, the Debtor and Rainey achieved a settlement of the 1998 Lawsuit. They executed a document entitled "Mediation Settlement Agreement" (the Mediation Settlement Agreement) whereby the Debtor was to pay Rainey the sum of $300,000.00, with this amount to be paid as follows: (a) The Debtor was to execute a promissory note for $150,000.00 bearing interest at 10% per annum and to be paid in sixty consecutive monthly installments of $3,160.73, beginning on August 1, 2000; and (b) $150,000.00 was to be paid if and when monies were ever generated from any of the pending suits comprising the Davenport/Brio Litigation. [Transcript D1, page 194, line 3 through p. 195, line 5; Rainey's Exhibit # 22; Debtor's Exhibit # 23].

50. On November 20, 1999, pursuant to the Mediation Settlement Agreement, the Debtor executed a promissory note in the amount of $150,000.00 to be repaid in 60 monthly installments of $3,160.72, beginning on August 1, 2000, and

on the first day of each month thereafter until paid in full. [Transcript D1, p. 196, line 19 through p. 197, line 6; Rainey's Exhibit # 23].

51. Except for the *de minimus* amount of $2,000.00, Rainey has not received any payment from the Davenport/Brio Litigation; and given the unsuccessful results of the litigation since the execution of the Mediation Settlement Agreement, neither the Debtor nor Rainey ever expects that Rainey will receive any monies in the future from this particular litigation. [Transcript D1, p. 195, line 10 through p. 196, line 12].[4]

52. At mediation, the Debtor attempted to convince Rainey to resume representing the plaintiffs in the Davenport/Brio Litigation. Rainey refused. At trial, the Debtor admitted that all terms of the mediated settlement were set forth in the Mediation Settlement Agreement and that Rainey had no obligation to work on the Davenport /Brio Litigation. [Transcript D1, p. 198, line 3 through p. 199, line 7; Rainey's Exhibit # 22].

53. On August 1, 2000, the date that the first installment was due to be paid under the $150,000.00 promissory note, the Debtor failed to make the payment. [Transcript D1, p. 199, lines 8–12].

54. Pursuant to the terms of the Mediation Settlement Agreement, because the Debtor defaulted under the promissory note, Rainey filed an amended petition in the 1998 Lawsuit requesting the Harris County District Court to enforce the terms of the Mediation Settlement Agreement. Rainey filed this amended petition on August 9, 2000. [Transcript D1, p. 199, lines 13–15; Rainey's Exhibit # 24].

55. After Rainey filed the amended petition, the Debtor began making payments under the promissory note. Because the Debtor began performing under the note, Rainey non-suited the 1998 Lawsuit on September 22, 2000. [Transcript D1, p. 199, lines 16–19; Rainey's Exhibit # 25; Debtor's Exhibit # 24]. The Debtor made thirteen consecutive monthly payments, representing the payments due on August 1, 2000, up to and including August 1, 2001, but she failed to make the payment due on September 1, 2001.[5] [Transcript D1, p.

**4.** The Debtor and Rainey have both arrived at this conclusion because one month before the trial of this adversary proceeding, The Honorable John R. Froeschner, the United States Magistrate Judge to whom the Davenport/Brio Litigation was referred by the United States District Court for the Southern District of Texas, Galveston Division, issued a 23–page Report and Recommendation recommending, among other recommendations, that the suit be dismissed. [Debtor's Exhibit # 41].

**5.** At trial, the Debtor spent a portion of her time cross-examining Rainey about a chart attached as the last page of Rainey's Exhibit 28 (This chart is also Debtor's Exhibit # 40).

This chart sets forth a history of the thirteen payments that the Debtor made to Rainey. Although it is undisputed that the Debtor made these payments during the 13–month period between August 1, 2000, and August 1, 2001, the chart mistakenly showed that she made the payments between August 1, 2001, and August 1, 2002. The Debtor seemed to believe that her defense would be strengthened through prolonged cross-examination of Rainey over this error. When this Court asked the Debtor whether she was seriously going to take the stand and testify under oath that she made the payments between August 1, 2001, and August 1, 2002, she immediately stated that she was not. [Transcript D2, p. 222, line 3 through p. 232, line 7]. All in all,

199, line 20 through line p. 200, line 7].

56. On September 13, 2001, Rainey's attorney, Russell Briggs, sent a telefax letter to the Debtor setting forth that the payment due to Rainey on September 1, 2001, was not made and that Rainey would take action against her if payment was not made by the close of business on September 19, 2001. Later that same day, the Debtor sent a telefax letter to Mr. Briggs acknowledging that she was in default and setting forth that her law firm was waiting to receive expected fees and that she hoped to have those fees paid soon so that she could pay Rainey. [Debtor's Exhibit # 12].

57. On September 20, 2001, Rainey's attorney responded to the Debtor's letter of September 13, 2001, by sending the Debtor a letter setting forth that: (a) the Debtor had failed to make the payment due on September 1, 2001; (b) Rainey was willing to give her until October 5, 2001, to cure this default; and (c) if this payment, as well as the regularly scheduled payment due on October 1, 2001, were not both paid by October 5, 2001, then Rainey would file suit for breach of the Mediation Settlement Agreement. [Debtor's Exhibit # 67; Transcript D2, p. 218, line 22 through p. 222, line 2].

58. The Debtor failed to cure the default under the promissory note. On October 29, 2001, Rainey filed a second suit against the Debtor in the District Court of Harris County, Texas. The style of this suit was cause number 2001–55529, 129th Judicial District, *Ron Rainey v. Valorie Davenport Legal Group* (the 2001 Lawsuit).[6] This suit alleged that the Debtor had breached the Mediation Settlement Agreement and the $150,000.00 promissory note, and Rainey requested judgment for the following amount: (a) the balance of the $150,000.00 note; (b) attorney's fees provided for under the note; and (c) the $150,000.00 from the Davenport/Brio Litigation if fees were ever paid in that litigation. [Transcript D1, p. 200, lines 8–17; Debtor's Exhibit # 3; Rainey's Exhibit # 26].

59. On February 11, 2002, the Debtor, representing herself *pro se,* filed a general denial in the 2001 Lawsuit. [Transcript D1, p. 200, lines 16–17; Debtor's Exhibit # 4; Rainey's Exhibit # 27].

60. On April 5, 2002, Rainey filed a Motion for Summary Judgment in the 2001 Lawsuit. [Debtor's Exhibit # 5; Rainey's Exhibit # 28]. Additionally, on April 5, 2002, Rainey filed a Notice of Submission setting forth that his Motion for Summary Judgment was set on the Court's submission docket for April 29, 2002. [Rainey's Exhibit # 29].

61. On April 23, 2002, the Harris County District Court signed a Docket Control Order in the 2001 Lawsuit. [Debtor's Exhibit # 6]. This order set forth that trial would be held on December 9, 2002.

---

not only did the Debtor's cross-examination do nothing to help her defense, but it hurt her credibility.

6. Although the Original Petition was filed in the 129th Judicial District, the suit was subsequently transferred to the 269th Judicial District.

62. On April 29, 2002, the Debtor filed two pleadings: (a) Defendant's Motion for Continuance on Submission and Filing Response to Plaintiff's Motion for Summary Judgment; and (b) Defendant's Motion for Leave to File Late Response to Plaintiff's Motion for Summary Judgment. [Rainey's Exhibits # 30 and 31].

63. On April 30, 2002, the Debtor filed her Initial Response to Rainey's Motion for Summary Judgment in the 2001 Lawsuit. [Debtor's Exhibit # 7; Rainey's Exhibit # 32].

64. On May 8, 2002, Rainey filed a Notice of Hearing setting forth that on May 17, 2002, at 1:00 p.m., a hearing would be held on his Motion for Summary Judgment. [Rainey's Exhibit # 33]. However, no such hearing was held.

65. On May 10, 2002, the Debtor filed her First Amended Original Answer in the 2001 Lawsuit. [Debtor's Exhibit # 8; Rainey's Exhibit # 34].

66. On October 25, 2002, Rainey filed a Notice of Submission setting forth that his Motion for Summary Judgment would be presented to the Court for ruling without the necessity of a hearing unless the Debtor requested one. [Rainey's Exhibit # 35].

67. On November 11, 2002, the Debtor filed a Motion for Continuance on Rainey's Motion for Summary Judgment in the 2001 Lawsuit. The basis for this motion was that the Debtor was still conducting discovery. Included in this Motion for Continuance was what the Debtor labeled a "Preliminary Response to Motion for Summary Judgment." [Debtor's Exhibit # 11; Rainey's Exhibit # 36].

68. On December 2, 2002, the Debtor filed another Motion for Continuance, together with a Plea in Abatement, in the 2001 Lawsuit. The basis of. this Motion was that the Debtor was about to undergo shoulder surgery. [Debtor's Exhibit # 14; Rainey's Exhibit # 37].

69. On December 4, 2002, in the 2001 Lawsuit, Rainey filed a Response to the Debtor's Motion for Continuance or in the Alternative Plea in Abatement. [Debtor's Exhibit 15]. Rainey opposed the Debtor's Motion.

70. On December 4, 2002, in the 2001 Lawsuit, the Court granted the Debtor's Motion for Continuance but expressly set forth on the docket sheet that no further continuances would be granted absent a showing of good cause. [Debtor's Exhibit # 2; Rainey's Exhibit # 39].[7]

71. On February 18, 2003, Rainey's attorney in the 2001 Lawsuit telefaxed to the Debtor a Notice of Hearing setting forth that the hearing on Rainey's Motion for Summary Judgment would be held on March 7, 2003, at 11:00 a.m. [Debtor's Exhibit # 17; Rainey's Exhibit # 38].

72. On March 6, 2003, the Debtor filed a Motion for Continuance in the 2001 Lawsuit requesting that the hearing scheduled for March 7,

7. At trial, the Debtor incorrectly testified that this Motion was denied. [Transcript D3, p. 201, lines 2–6].

2003 be continued. [Debtor's Exhibit # 18; Rainey's Exhibit # 40].

73. On March 7, 2003, in the 2001 Lawsuit the Court denied the Debtor's Motion for Continuance. The Debtor failed to appear at the hearing. The Court then granted Plaintiff's Motion for Summary Judgment (the Judgment) and awarded judgment for Rainey against the Debtor in the following amounts: (a) the principal sum of $120,359.13; (b) accrued interest on such principal sum at the rate of 18% per annum from August 6, 2001, through the date of judgment in the amount of $16,248.48; (c) post judgment interest against Debtor at the rate of 18% per annum; (d) attorney's fees in the amount of $34,151.90, together with interest after judgment on same against Debtor at the rate of 18% per annum; and (c) $150,000.00 of the "Funds" received (actually or constructively) by Debtor or Debtor's law offices from the following cases:

(i) Cause No. G–96–494; *Le, et al., v. Monsanto, et al.,* in the United States District Court, Southern District of Texas, Galveston Division.

(ii) Cause No. G–96–498; *Rivas, et al., v. Monsanto, et al.,* in the United States District Court, Southern District of Texas, Galveston Division.

(iii) Cause No. 96–62960; *Kim Ngoc Ivey v. Medical Engineering Corp., et al.,* in the District Court of Harris County Texas, 334th Judicial District.

The Judgment defines "Funds" to mean the total monies received (actually or constructively) by Debtor or Debtor's law offices, less client expenses directly related to the respective cases and less proceeds paid to clients as damages or compensation. If "Funds" exceed $150,000.00, the Judgment awards the excess to be applied to the promissory note made by the Debtor in favor of Rainey.

The Judgment further awards Rainey: (a) attorney's fees and costs in the amount of $15,000.00 if Debtor should appeal the Judgment to the Court of Appeals; (b) attorney's fees and costs in the amount of $5,000.00 if Debtor should appeal the Judgment to the Texas Supreme Court; and (c) costs of the suit, together with interest after judgment on the same at the maximum rate provided by statute. [Rainey's Exhibit # 41; Debtor's Exhibit # 19].

74. On April 7, 2003, the Debtor filed a Motion for New Trial in the 2001 Lawsuit. [Debtor's Exhibit # 20; Rainey's Exhibit # 43].

75. On May 9, 2003, the Harris County District Court held a hearing on the Debtor's Motion for New Trial, and on May 30, 2003, this Court denied the Debtor's Motion for New Trial. [Debtor's Exhibit # 21; Rainey's Exhibit # 44].

76. On June 2, 2003, the Debtor filed a Chapter 11 petition. [Transcript D1, p. 19, line 22 through p. 20, line 3; Docket No. 1].

77. On September 30, 2003, Rainey filed a proof of claim in this bankruptcy case. Rainey attached to this proof of claim a copy of the Judgment rendered in the 2001 Lawsuit. The amount of this claim is $321,807.35, which represents the actual amount awarded in the Judgment, plus interest that had accrued since the entry of the Judgment. [Rainey's Exhibit # 60]. The Debtor has never filed an objection to this proof of claim.

78. On October 7, 2003, the Debtor filed her Original Disclosure State-

ment. [Rainey's Exhibit # 52; Docket No. 56]. On page 11, Rainey's claim is described as "Allowed as filed."

79. On April 30, 2004, the Debtor's Chapter 11 case was converted to a Chapter 7 case. [Transcript D1, p. 20, lines 4–8; Debtor's Exhibit # 72; Docket No. 104].

80. On August 9, 2004, Rainey filed in this Court his Complaint to Determine Dischargeability of Debt. [Rainey's Exhibit # 50; Docket No. 165].

81. On December 14, 2004, the Debtor filed her Original Answer, Counterclaim and Request for Jury Trial.[8] [Rainey' Exhibit # 46].

82. Trial of this adversary proceeding was held on April 12, 13, 14, 15, 21 and 22, 2005.

83. The attorneys' fees incurred by Rainey for the prosecution of this adversary proceeding totaled $35,496.35 (for Michael Essmyer's services) and $1,968.75 (for William A. Short Jr.'s services), respectively, for an aggregate amount of fees of $37,465.10. The expenses incurred by Rainey totaled $3,838.00. Therefore, the total amount of attorney's fees and expenses incurred by Rainey is $41,303.10.[9] Further, if the Debtor appeals this Court's order relating to this adversary proceeding, Rainey's counsel estimated that additional attorney's fees will be as follows: (a) at least $2,500.00 for ten hours of work; (b) another $7,500.00 for any appeal to the Fifth Circuit; and (c) another $2,500.00 for any appeal to the U.S. Supreme Court and, if oral arguments are held, another $7,500.00. [Rainey's Exhibits # 73, 73A and 73B; Transcript D2, p. 284, line 23 through p. 298, line 11].

## III. CREDIBILITY OF WITNESSES

Five witnesses testified during this six-day trial: (1) the Debtor; (2) Rainey; (3) Tina K. Salem, an expert witness retained by Rainey; (4) Denise W. Novotny, the Debtor's sister; and (5) Michael M. Essmyer, the attorney for Rainey (whose testimony solely concerned the attorney's fees incurred by Rainey). Set forth below are the Court's findings concerning the credibility of these witnesses.

### A. Ron S. Rainey (Rainey)

Rainey testified on the first and second day of trial. He was forthright and responded directly and promptly to questions, both on direct and cross-examination. This Court found Rainey to be a credible witness.

### B. Michael M. Essmyer (Essmyer)

Essmyer testified on the second day of trial for a few minutes on the sole issue of the attorney's fees and expenses incurred by Rainey. This Court found Essmyer to be a credible witness.

### C. Tina K. Salem (Salem)

Salem testified for approximately 4½ hours on the second day of the trial. She appeared as an expert witness for Rainey. Her testimony concerned, among other issues, whether the Debtor had a fiduciary duty to Rainey with respect to safeguard-

---

8. The Court denied the Debtor's Request for Jury Trial. The Court also dismissed the Debtor's counterclaims on the grounds that these claims belong to the Chapter 7 Trustee and, therefore, the Debtor has no standing to bring these counterclaims.

9. The Court finds that these fees and expenses are reasonable.

ing the monies received from the Brio/ DOP Litigation pending resolution of how much Rainey was to receive. Although the Court found Salem to be a very engaging and credible witness, the Court disagrees with her conclusion that the Debtor owed a fiduciary duty to Rainey. With respect to any other opinions that Salem gave—either during her court appearance or in her written report [Rainey's Exhibit # 55]—to the extent that such opinions are consistent with the findings of fact and conclusions of law made by this Court, such consistency is entirely coincidental. This Court's findings of fact and conclusions of law are made based not upon Salem's testimony or report, but rather upon this Court's evaluation of the testimony given by the Debtor, Rainey, Essmyer and the Debtor's sister, and this Court's own research of the legal issues involved in this dispute.

D. Valorie W. Davenport (the Debtor)

The Debtor is a licensed attorney who has been practicing law for over twenty years. [FOF Nos. 1 and 2]. Because she is a well-educated person who is capable of understanding complex issues, it is logical to infer that she understands the difference between truth and lies. *See In re Graham,* 199 B.R. 157, 159–160 (Bankr. N.D.Ohio 1996); *see also In re W. World Funding, Inc.,* 52 B.R. 743, 753 (Bankr. D.Nev.1985) (noting that the Court may determine whether a witness can discern the difference between truth and lies).

The Debtor testified extensively during trial. Rainey's attorney called her as an adverse witness, and she was in the witness box for approximately eight hours of the first day of trial. The Debtor, representing herself *pro se,* then called herself as a witness when she put on her case in chief, which began during the afternoon of the third day of the trial. She testified for approximately three hours on that day. She then continued her testimony for a portion of the morning on the fourth day. Finally, on the sixth and last day of trial, over the objection of Rainey's counsel, this Court allowed the Debtor to re-take the stand and give further testimony. On this day, she testified for approximately one and one-half hours. All in all, the Debtor testified for over thirteen hours. This Court therefore had ample opportunity to observe the Debtor and listen to the answers she gave as both an adverse witness and as a witness examining herself on direct examination.

In addition to observing and listening to the Debtor at trial, this Court has read, and re-read, the trial transcript and the extensive notes that the Court made at trial. Reviewing the transcript and notes confirmed the initial reactions that this Court had during the course of the trial. These initial reactions, plus post-trial reflections, have led this Court to conclude that the Debtor is not credible.

The Court has arrived at this conclusion for several reasons. First, the Debtor's testimony at trial about her position on one of the key issues in this suit—Under the Agreement, when was Rainey to be paid his percentage interest in the fees generated by the Brio/DOP Litigation?— directly contradicted her actions and words in 1996, 1997, 1998 and 1999. At trial, the Debtor incessantly insisted that under the Agreement, Rainey was not entitled to receive a dime until all the Brio/ DOP Litigation—which included not only the O'Quinn/Brio Litigation and the Williams/Brio Litigation, but also the Davenport/Brio Litigation—was completely over. According to the Debtor, under the Agreement, Rainey was not entitled to any money until all of this litigation was concluded because his fee could not be determined until every expense from the Brio/

DOP Litigation could be calculated. According to the Debtor, if the total fees exceeded the total expenses, Rainey would receive 15% of the surplus; but if the total expenses exceeded the total fees, then Rainey would receive nothing. [Transcript D, p. 83, line 3 through p. 84, line 5; Transcript D1, p. 165, lines 18–21; Transcript D1, p. 166, line 25 through p. 167, line 9; Transcript D1, p. 168, lines 1–25].

At trial, the Debtor pointed to the following highlighted language in the Agreement to support what she claimed was her longstanding position that Rainey was not entitled to any payment until every piece of the Brio/DOP Litigation was concluded:

This document shall hereby memorialize a prior assignment to Ron Rainey, as a condition of Ron Rainey accepting employment with the Law Offices of Valorie W. Davenport in October of 1993, of an amount equal to 15% (fifteen percent), *less expenses directly related to the Brio/DOP litigation, of the interest of The Law Offices of Valorie W. Davenport in the outcome of any and all Brio/DOP litigation of which the law office of Valorie W. Davenport had an interest in as of October 3, 1993 and/or acquired an interest in prior to the date below.* Ron Rainey is also hereby assigned the same percentage interest in any and all Brio/DOP litigation of which The Law Offices of Valorie W. Daven-

port may acquire subsequent to the date below as long as Ron Rainey works on and is associated with this subsequently acquired litigation. This assignment includes the Aguilar, Le and Melendez lawsuits previously settled, but does not include any prior ad litem disputes with the 151st court. (emphasis added).

 This Court does not believe that this highlighted language supports the interpretation that the Debtor articulated at trial.[10] Assuming, however, that her interpretation of this language is reasonable, the Debtor *never once expressed* this view to Rainey in 1996, 1997, 1998, or 1999. These four years are important because 1996 was the year that the Debtor and Rainey negotiated the language in, and then executed, the Agreement; 1997 was the year that the Williams/Brio Litigation settled—thereby generating the highest fees of all the Brio/DOP Litigation—with the Debtor actually distributing some monies to Rainey; 1998 was the year that Rainey attempted to negotiate a settlement with the Debtor and, when he was unsuccessful in doing so, filed suit against her; and 1999 was the year that the Debtor and Rainey participated in mediation to resolve their dispute. Both the Debtor's words and actions in these years strongly indicate that the Debtor never interpreted the Agreement in the manner about which she testified at trial.[11]

---

**10.** Based upon the testimony that this Court heard at trial, plus this Court's review of various exhibits, and its own reading of the Agreement in whole and the highlighted language in particular, this Court finds that the most reasonable interpretation is this: for each discrete suit of the Brio/BOP Litigation that generated net fees to the Davenport Law Firm, Rainey was to receive 15% of those fees upon delivery of the funds to the firm.

**11.** Even if she really did have this interpretation, the Debtor is equitably estopped from now adopting this interpretation. "One who

by his conduct has induced another to act in a particular manner should not be permitted to adopt an inconsistent position and thereby cause loss or injury to the other." *Maguire Oil Co. v. City of Houston,* 69 S.W.3d 350, 367 (Tex.App.-Texarkana 2002, pet. denied); *Fabrique, Inc. v. Corman,* 796 S.W.2d 790, 792 (Tex.App.-Dallas 1990, writ denied). The Debtor induced Rainey to join her firm by promising him a percentage of the fees, and in fact paid him some of these fees in 1997. The Debtor is now causing Rainey to suffer loss or injury by adopting the inconsistent position that she does not owe him a dime

In 1996, after the Debtor wrote Rainey a letter requesting him to set forth his understanding of the terms of his employment, [FOF No. 18], she did *not* tell him that regardless of those terms, no money would be paid to him unless aggregate fees exceeded aggregate expenses after the entire Brio/DOP Litigation was complete. In fact, after her firm received the fee from the O'Quinn/Brio Litigation in November of 1996, the Debtor, spent some of those funds to pay for her own personal expenses and overhead at her firm—acts which indicate that she herself did not believe there was a need to wait until all litigation was over. [FOF No. 36].[12] As important, the $162,514.03 check which O'Quinn delivered to the Debtor's firm was actually a small percentage (13.9%) of the entire fee earned by the Debtor's firm because O'Quinn had deducted several hundred thousand dollars for monies owed to him on a loan he[13] had extended to the Debtor to purchase her home on Sunset Boulevard. [FOF No. 15]. These facts underscore more specifically the direct contradiction between the Debtor's words and actions: the Debtor personally was not waiting until all the Brio/DOP Litigation was concluded before she took her share of the fees generated from those suits that had been resolved.

The same can be said for the Debtor in 1997, which was *after* the Agreement was executed. The Debtor continued to spend Brio/DOP Litigation fees to pay for her personal bills and for her firm's overhead and rent. [FOF No. 38]. These actions reveal, once again, that the Debtor herself was not waiting until the end of all the Brio/DOP Litigation to distribute fees. Moreover, her testimony at trial that Rainey was supposed to wait until the end is an interpretation as inequitable as it is tortured: attorneys who are in a fee-sharing arrangement expect to receive their distributions simultaneously. This fact is particularly telling because by this time, the Debtor was well aware of Rainey's disenchantment about not having received any payment from the fees that had been collected from those suits that had already settled.

If, as in 1996, the Debtor had not paid anything to Rainey in 1997, then her trial testimony that he needed to wait until the end of the entire Brio/DOP Litigation would have at least some measure of consistency—even if her own unwillingness to wait until all suits were resolved undermines her position. *But in 1997, the Debtor paid Rainey three payments totaling $400,000.00.*[14] Two of these payments—each for $50,000.00—came in the wake of the Debtor's firm receiving $500,000.00 from the Williams/Brio Litigation; and the third payment for $300,000.00 came after the Davenport Law Firm received another $2,245,447.39 from the Williams/Brio Litigation. [FOF Nos. 25, 26, 27, 28 and 29]. Moreover, all three payments to Rainey were made several days after he had informed the Debtor that he would be leaving her firm, and the last two payments actually were paid several days after Rai-

---

until all of the Brio/DOP Litigation is completed.

12. It is no small fact that the Debtor spent these funds because, by this time, Rainey had responded to the Debtor's request to set forth his recollection of the terms of his employment [FOF No. 19], and his letter was quite clear that expenses did *not* include salaries, or any firm overhead.

13. Or his law firm; the record is not clear.

14. Actually, the Debtor paid Rainey $300,000.00 and $50,000.00 herself and authorized Williams to directly pay Rainey an additional $50,000.00. [D1, p. 55 line 29 through p. 56 line 1; D1, p. 59, line 7 through p. 60, line 18].

ney had departed from the firm. At this time, the suits comprising the Davenport/Brio Litigation were still far from being over; indeed, the Davenport/Brio Litigation was not over until March of 2005. [FOF No. 51]. If, as the Debtor testified at trial, Rainey was not entitled to any payments until every last one of the suits comprising the Brio/DOP Litigation was over, then why did the Debtor pay Rainey $400,000.00 after the Davenport Law Firm received more than $2.7 million in fees from the resolution of only the Williams/Brio Litigation—a figure, it should be noted, equal to approximately 15%, as set forth in the Agreement?

The only reasonable explanation is this: the Debtor believed the terms of the Agreement were that Rainey was to receive 15% of fees whenever the fees from any discrete suit were paid to the Davenport Law Firm so long as the expenses relating to the resolved suit or suits had been deducted (which was the case in the Williams/Brio Litigation). This interpretation is not only plausible because of the payments which the Debtor made to Rainey in September of 1997, but also because during this time period, the Debtor herself was taking and spending her share of the fees that had been paid to her law firm from the O'Quinn/Brio Litigation and Williams/Brio Litigation.

At trial, the Debtor testified that the three payments to Rainey were "advances." [Transcript D1, p. 84, lines 2–5; Transcript D1, p. 68, lines 13–17; Transcript D3, p. 179, lines 7–15; Transcript D4, p. 60, lines 3–6]. She did so in an effort to justify her making these payments to Rainey while simultaneously

holding to her position that the Agreement required him to wait until all of the Brio/DOP Litigation was complete before he was to be paid any amount. This testimony is not believable for three reasons. First, the Agreement itself contains no provision addressing Rainey's right to an advance. Second, when the Debtor paid Rainey the $400,000.00 in September of 1997, she never indicated they were "advances". Third, the inference that must be drawn from the Debtor's testimony is that Rainey would have had to repay the $400,000.00 "advance" [15] if, at the end of all of the Brio/DOP Litigation, total expenses exceeded total fees such that Rainey was entitled to receive nothing—or at least something less than $400,000.00. Yet, the Debtor never discussed with Rainey repayment terms, such as what the interest rate would be or when the loan would have to be repaid. Moreover, at the time the Debtor made these payments to Rainey, she knew he was soon to depart from her firm or he had already left—much to her dismay if her testimony at trial is to be believed. She also knew that her firm was experiencing significant cash flow problems. [FOF Nos. 40 and 47]. Under these circumstances, it is too much for this Court to believe that the Debtor would loan Rainey the sum of $400,000.00. The Court believes that the far more likely reason the Debtor paid Rainey is that she believed the Agreement required her to do so and, having failed to pay Rainey anything from the O'Quinn/Brio Litigation, she was worried that Rainey would sue her if she did not pay him his share of the Williams/Brio Litigation fee.

This Court also finds the Debtor's testimony about "advances" to be terribly di-

---

15. The word "advance" connotes the extension of credit which is to be repaid with interest. See, e.g., *Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.,* 336 F.3d 410, 415–416 (5th Cir.2003); *Elliott v.*

*United States,* 332 F.3d 753, 764 (4th Cir. 2003) ("The Court has concluded that, under § 1014, a false statement need not be material to a financial institution's decision to *advance or loan funds.*") (emphasis added).

singenuous given her trial testimony about Rainey. Throughout the trial, and in certain portions of her correspondence introduced as exhibits, the Debtor complained of Rainey's poor lawyering skills. For example, she testified that Rainey "was letting everybody else step all over him. . . ." [Transcript D3, p. 150, lines 3–4]; and she told the mediator in April of 1999 that "[o]nce the deal was in place and Ron Rainey came over, he was completely ineffective in moving VWD's [i.e. the Debtor's] existing cases; working up and finalizing appeals; or, even in handling routine administrative matters which were to be directly placed under his supervision and control." [Debtor's Exhibit # 64]. If the Debtor believed that Rainey was as miserable an attorney as she testified and as her letter to the mediator described, would she really have advanced him $400,000.00 in September of 1997 expecting this advance to be paid back if, at the end of all the Brio/DOP Litigation, the aggregate expenses exceeded the aggregate fees, or where the aggregate fees exceeded the aggregate expenses by some amount less than $400,000.00? Indeed, at the time the Debtor paid him the $400,000.00, she knew that he was about to start his own law firm. [Transcript D1, p. 177, line 3; Transcript D1, p. 235, line 17 through p. 237, line 1; Transcript D1, p. 271, line 21 through p. 272, line 16]. If he was such a poor lawyer and wretched administrator, she could not have reasonably believed that he would succeed on his own and therefore generate sufficient income to repay the $400,000.00 advance should the total expenses exceed the total fees at the conclusion of all the Brio/DOP Litigation.[16] No reasonable person would have extended such an advance, particularly when that very person's own firm was experiencing cash flow problems. This Court believes, and so finds, that the Debtor paid the money because she believed that the Agreement so required and that Rainey would have a meritorious suit against her if she refused to pay him.[17]

The Debtor's testimony at trial that Rainey was an incompetent attorney and a weak person also calls into question the Debtor's credibility for a reason wholly unrelated to the characterization of the $400,000.00 paid to Rainey as an advance. In the proceeding at bar, the Debtor has pleaded as an affirmative defense that Rainey did not mitigate his damages because after he had resigned from her firm and joined another firm, she asked him to help her prosecute the Davenport/Brio Litigation but he refused. [Transcript D1, p. 160, lines 5–15].

16. Despite the Debtor's barrage of criticism against Rainey, when Rainey's counsel asked her why she signed the Agreement, she testified that Rainey "pressured me to sign it." [Transcript D1 p. 158, lines 4–7, Transcript D1, p. 38, lines 8–13; Transcript D1, p. 39, line 25 through p. 40, line 16; Transcript D1, p. 42, lines 18–21; Transcript D1, p. 146, line 8 through p. 147, line 15; Transcript, p. 158, lines 1–7; Transcript D1, p. 164, line 25 through p. 165, line 8; Transcript D3, p. 12, lines 9–12; Transcript D3, p. 191, lines 18–25; Transcript D3, p. 192, line 21 through p. 193, line 13]. So, when it served the Debtor's interest—here, to provide testimony to support her affirmative defense that she signed the Agreement under duress—Rainey was such an overwhelming personality that he was able to pressure the Debtor, a seasoned 20–year trial lawyer who ran her own law firm, into signing the Agreement. On the other hand, when it served her interest to portray Rainey as someone who "was letting everybody else step all over him"—with the goal of showing him to be so weak and incompetent that he did not deserve the 15% fee under the Agreement—she did so without hesitation. This Court can only conclude that the Debtor speaks out of both sides of her mouth. Her credibility with this Court is nil.

17. This finding of fact is Number 84.

■ This Court believes that the Debtor's mitigation defense must fail because Rainey had no duty to participate in the prosecution of the Davenport/Brio Litigation. *See infra.* However, even if this mitigation theory is viable in certain circumstances, it is completely illogical in this situation given the Debtor's testimony about Rainey's skills as an attorney. She has testified that Rainey allowed people to step all over him [Transcript D3, p. 150, lines 3–4] and she told the mediator that he was completely ineffective. Indeed, she testified that she also has an affirmative defense of contributory negligence because when Williams pulled the funding of $65,000.00 per month, Rainey "was not performing his duties as he was required to perform." [Transcript D1, p. 160, lines 18–23]. If all this was true—and the Debtor was adamant at trial that it was—then as an attorney who had a duty to zealously represent her clients in the Davenport/Brio Litigation, why would she want to bring Rainey back and have him assist in the remaining Brio/DOP Litigation? No capable attorney—and the Debtor testified at trial that she was "a very good lawyer" [Transcript D1, p. 205, line 2]—would want to bring another attorney into a case as co-counsel if the attorney already working the case believes that the prospective co-counsel is as horrid a lawyer as the Debtor described Rainey at trial and in pre-trial correspondence. Indeed, to bring such a poor attorney into the suit as co-counsel would probably be a negligent referral and expose the attorney already on the suit to a negligence claim by the clients. A cause of action for negligent referral of one professional by another is a legitimate claim for a client to assert. *See, e.g. Noris v. Silver,* 701 So.2d 1238 (Fla. App.1997) (discussing a client's cause of action against an attorney for that attorney's negligent referral to the client of a personal injury attorney who, upon reten-

tion, committed malpractice); *Tranor v. The Bloomsburg Hosp.,* 60 F.Supp.2d 412 (M.D.Pa.1999) (discussing a client's cause of action against her doctor for negligently referring her to a surgeon who botched the operation). Moreover, and by no means the least important point, to take such action would be unethical because bringing an incompetent attorney on board would constitute a violation of the Debtor's fiduciary duty to her clients for failing to protect the interests of her clients. *Cf.* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.14, *reprinted in* TEX. GOVT.CODE ANN., tit. 2, Subt. G app. A, Art. 10, § 9, Rule 1.14 (Vernon 2005) (TEX. STATE BAR R. art. X, § 9).

Under these circumstances, this Court finds that the Debtor's testimony about Rainey's incompetence is not credible. The Court believes that the Debtor, who never once told Rainey that he was performing poorly when he was at her firm [Transcript D4, p. 18, line 12 through p. 19, line 13], and who never removed him from the Brio/DOP Litigation during his entire tenure at her firm [FOF No. 9], chose to fabricate stories about Rainey after he departed her law firm in order to create what she believed would be meritorious affirmative defenses. The Debtor has failed in this endeavor.

The Debtor's letter to Rainey of January 12, 1998, [FOF No. 40], provides a further indication of the Debtor's poor credibility. The Debtor wrote this letter to Rainey approximately four months after he had departed her firm and roughly three months before he filed the 1998 Lawsuit. At this point, the Debtor and Rainey were communicating directly about whether the Debtor was going to pay Rainey what he believed she still owed him under the Agreement. The Debtor wrote him a lengthy letter setting forth her reasons as to why she did not owe him any-

thing. Nowhere in this letter is there any reference to the reason that the Debtor constantly gave at trial: namely, that Rainey was entitled to nothing until (a) all of the Brio/DOP Litigation was complete; and (b) it was determined that total aggregate fees exceeded total aggregate expenses. It strains credulity that this letter is wholly devoid of any such discussion if the Debtor has really believed all along—as she testified at trial—that the Agreement requires Rainey to wait until the end of all the Brio/DOP Litigation before receiving any distribution.

Indeed, the last paragraph of the Debtor's January 12, 1998, letter is telling because the message is not that Rainey must wait until the end of the Brio/DOP Litigation to see if money will be coming his way. Rather, the message is that the Brio/DOP Litigation has not generated the fees that the Debtor thought it would; that Rainey has already received a "great profit;" that the Debtor has absorbed a staggering loss; and that therefore "[i]n light of these facts my feeling is that we are more than right with each other"—i.e. the Debtor has already paid Rainey enough money to fulfill her promise and he will receive no more. At that time, the Debtor's position was clear: she was not going to pay one more cent to Rainey, not because total expenses exceeded total fees—this determination could not yet be made because the Davenport/Brio Litigation was far from over—but because the fees that had already been generated fell short of expectations, the Debtor herself was in financial difficulty, and she had already paid Rainey enough money. Under these circumstances, the Court finds that the Debtor was not being candid at trial when she testified that her position all along has been that the Agreement provides that Rainey is not entitled to any money until the entire Brio/DOP Litigation is completely over.

It is worth noting that in many respects, the Debtor's position on January 12, 1998, was the same position that she communicated to the mediator over a year later when Rainey and she were in mediation attempting to settle the 1998 Lawsuit. On April 19, 1999, the Debtor wrote the mediator a 7-page letter setting forth her thoughts as to why Rainey was not entitled to receive any more money. [FOF No. 47]. She informed the mediator that she was experiencing "mounting debt" and that the Brio/DOP Litigation had not generated the fees that she had initially anticipated. Then, in the last two paragraphs of this letter, the Debtor expressed her belief that a further reason that Rainey was not entitled to any money was not because the Brio/DOP Litigation was still ongoing but rather because:

As far as VWD [i.e. the Debtor] is concerned, RSR [i.e. Rainey] has been grossly over-paid and his skills highly over-rated. Many others who worked directly with RSR are ready to attest to his lack of competence, commitment and effective contribution to the ultimate result (albeit less that [sic] all had hoped) in the Brio case. His lack of commitment to the clients can and will, if necessary, clearly be shown by what has now happened in Galveston. Finally, as far as any benefit or income (beyond Brio) that he supposedly brought to VWD's firm, the numbers speak for themselves. In the entire time he worked at the Law Offices of VWD, RSR's total, combined figure for all four years amount to less than $25K in fees.

It is VWD's position that RSR is not entitled to one more dime from her firm, via Brio or otherwise. I guess this makes the potential for an amicable settlement look pretty bleak, doesn't it? [Debtor's Exhibit # 64].

If the Debtor really believed that the Agreement required Rainey to wait until all of the Brio/DOP Litigation was completed before he was entitled to receive any money, why did she not convey this position to the mediator? Why would she spend time discussing her own financial situation or blasting Rainey for his lack of competence and commitment? This Court believes, and so finds, that the Debtor, up until the time Rainey initiated this adversary proceeding, never believed that the Agreement required Rainey to wait until the end of all Brio/DOP Litigation.[18] At the time of the mediation, this Court believes, and so finds, that the Debtor interpreted the Agreement just as Rainey did, but because the fees were not as high as she anticipated, she decided to argue that Rainey's incompetence and her deteriorating financial condition barred Rainey from receiving more than the $400,000.00 that she had already paid him.[19] Then, once Rainey filed this adversary proceeding, the Debtor devised yet another basis for arguing that Rainey is not entitled to a dime more: the Agreement requires him to wait until the completion of every suit comprising the Brio/DOP Litigation. The interpretation that the Debtor articulated at trial is an interpretation that the Debtor formulated as a litigation strategy. It will not work.

In addition to the glaring inconsistencies of the Debtor's testimony on the key points of the dispute, discussed above, the Debtor's demeanor as a witness further undermined her credibility. At various points during trial, the Debtor did everything she could to avoid answering the question posed to her. For example, when Rainey's counsel asked the Debtor whether she had ever given Rainey back-up information on the expenses she claims relate to the O'Quinn/Brio Litigation, the Debtor did not want to answer the question:

Q We had the discussion about the $178,301.10 and in your direct testimony a moment ago you said that was definitely related to the Allen–Brio case expenses, correct?

A Yes, I think it is.

Q And what I need to know is do you have the back up for those expenses?

A I'll tell you one of the—I don't know if I do but I think that, perhaps, Mr. Williams does because if you look—

Q Okay. What I'm trying to find out today is do we—have you ever given Mr. Rainey the back up for those expenses; you haven't have you?

A I think Mr. Rainey has in the material he has been provided, yes.

Q Listen to my question.

A Yes, I do.

Q You've never given those—you personally have never given those to Mr. Rainey, have you?

A I've given Mr. Rainey access to that information. An (sp?) I believe it has been in the information he has reviewed.

Q One last time, if I may, perhaps my question wasn't clear. You, personally, have not handed to Mr. Rainey the back up for those documents, have you?

A I want to say it's not my job but—

THE COURT: Just answer the question, Ms. Davenport.

THE WITNESS: No, I have never personally done that, I've had other people do it for me.

---

18. This finding of fact is number 85.

19. This finding of fact is number 86.

[Transcript D3, p. 228, line 13 through p. 229, line 13].[20]

Finally, the Debtor's credibility is compromised by a pleading that she filed in one of the suits comprising the Davenport/Brio Litigation. One of these suits was in the United States District Court for the Southern District of Texas, Galveston Division. The Debtor failed to designate expert witnesses for the plaintiffs as required by the docket control order issued by the presiding U.S. District Judge, The Honorable Samuel B. Kent. The Debtor then moved for a continuance of the trial, which Judge Kent denied. [Debtor's Exhibit # 47]. Thereafter, the defendant filed a Motion for Summary Judgment on the grounds that the plaintiffs' failure to designate expert witnesses was sufficient grounds for granting summary judgment. The Debtor, as counsel for the plaintiffs, responded by filing a motion requesting the Court: (a) to reconsider its earlier order denying the motion to continue the trial setting; and (b) to grant the plaintiffs an extension of time to respond to the motion for summary judgment. [Debtor's Exhibit # 49]. Judge Kent denied this motion, but the Debtor again filed a motion for reconsideration. [Debtor's Exhibit # 52]. Judge Kent decided to hold a hearing on the motion for reconsideration simultaneously with the docket call for trial.

In an order Judge Kent issued after this hearing, he wrote:

On January 7, 2003, docket call was held as scheduled in the case. At that time, *four months* beyond the deadline and *one week* before trial, Plaintiffs still had not designated any expert witnesses, nor had Plaintiffs responded to Defendants' Motion for Summary Judgment. In an abundance of caution, this Court held an emergency hearing on Plaintiffs' Motion for Reconsideration. This Court and counsel for Plaintiffs and Defendants explored the options available to the Court in light of Plaintiffs' counsel's astonishing lapses in the handling of the case. At the hearing, the Court went to genuine lengths to seek out a way to balance the equities between the Parties and to avoid draconian results to Plaintiffs arising solely from Plaintiff's counsel's conduct. After protracted discussion on the record, Plaintiffs' counsel orally withdrew from this case and any other cases that she might have pending before this Court and agreed to submit to the Court written Motions to the same effect by the close of business on January 10, 2003.

Typical of her handling throughout this case, Plaintiffs' counsel hand-delivered the written Motion minutes before said deadline. *Although these Motions are timely filed and will be GRANTED,*

---

**20.** It is worth noting that the Debtor's sister, Denise Novotny, who helps run the office of the Davenport Law Firm, disagreed with the Debtor about Rainey having access to the records at the law firm concerning expenses, thereby casting further aspersions on the Debtor's credibility. Novotny's testimony was as follows:

Q All right. And I believe the testimony was he had free rein of the accounting. If Mr. Rainey came back after 9/15/1997, he wasn't going to have free rein of your accounting department was he?

A No.

Q In fact, he would have been ushered out of the offices?

A Well, politely.

Q He would have been asked to leave, correct?

A He would have been asked to leave.

Q And he would not have been allowed to look at the books after 9/15/1997, would he?

A Well, not on his own. He wouldn't have been able to go back there and have free rein of it. He could have asked for it and given some information maybe.

[Transcript D5, p. 53, lines 4–17].

184

*they are in all other respects manifestly misleading. Plaintiffs' counsel's Motions are disingenuous at best and deceitful at worst, by failing to incorporate either the spirit or the egregious facts of the crisis in which Plaintiffs' counsel found herself and placed her clients and by failing to acknowledge either the cause or the effects of her withdrawal. For example, in the Motions, Plaintiffs' counsel states that "[s]aid withdrawal of Plaintiffs Counsel will not delay the proceedings in this matter." Counsel for Pls. Mot. to Withdraw at ¶ 7. Nothing could be further from the truth. Plaintiffs' counsel was facing trial this week in the Greek case. It has consequently been delayed for months. For Plaintiffs' counsel to suggest that her withdrawal will not delay her clients' trials is simply preposterous.* (emphasis added) [Rainey's Exhibit # 45].

If the Debtor was willing to file pleadings in Judge Kent's Court which were "disingenuous at least and deceitful at worst," this Court cannot help but question her credibility in this adversary proceeding. Indeed, the example cited by Judge Kent—that the Debtor astoundingly represented in her motion to withdraw that her withdrawal would not delay the suit—underscores the very problem that the Debtor has exhibited in the adversary proceeding before this Court: she does not want to face reality. Just as she did not want to concede that her withdrawal from the suit in Judge Kent's court would delay the proceedings, so did she with equal fervor at trial here refuse to concede that, under the Agreement, she should have paid Rainey his 15 % share at the time that the Davenport Law Firm received any net fees from any one of the Brio/DOP suits that had been settled. Her trial testimony in this Court is no less disingenuous than her representation that her withdrawal from

the Galveston Division suit would not delay proceedings in Judge Kent's Court.

In sum, the Debtor's testimony was not credible, and this Court gives very little, if any, weight to her testimony.

E. Denise W. Novotny (Novotny)

Novotny was the only witness whom the Debtor called other than herself. Novotny is a licensed attorney who, in addition to having a law degree, received an undergraduate degree in accounting. Because Novotny is a well-educated person who is capable of understanding complex issues, it is logical to infer that she understands the difference between truth and lies. *See In re Graham,* 199 B.R. at 159–160; *see also In re W. World Funding, Inc.,* 52 B.R. at 753.

Novotny testified for over six hours. The Debtor called her on the fourth day of trial, and this direct examination lasted approximately 90 minutes. Rainey's counsel cross-examined Novotny on the fifth day of the trial for approximately two hours; and on the trial's last day, Novotny was on the stand for over three hours during which Rainey's counsel completed cross-examination and the Debtor conducted re-direct. This Court therefore had ample opportunity to observe Novotny and listen to the responses that she gave to the questions posed to her.

In addition to observing and listening to Novotny at trial, this Court's review of the transcript of the trial and the Court's trial notes has convinced this Court that Novotny's testimony must be received with a healthy degree of skepticism.

There are several reasons for this conclusion. First, Novotny is the Debtor's sister, and it was clear to this Court by observing the two sisters in the courtroom that they are very close. Indeed, Novotny herself admitted at trial that she loves the

Debtor and that she would "move the world" for her. [Transcript D5, p. 8, lines 20–22]. The Debtor resides with Novotny at Novotny's house. [Transcript D5, p. 9, lines 17–20]. When the Debtor formed her own firm in 1989, Novotny—who, at that time, had her degree in accounting but had not yet attended law school—helped the Debtor open her office, stayed on as an employee of the firm, and helped run the office. Then, once Novotny obtained her law degree in 1995, she worked at the Debtor's firm as a practicing lawyer.[21] [Transcript D4, p. 64, line 9 through p. 65, line 8; Transcript D5, p. 9, lines 9–14]. Given this extremely loving and close professional relationship, it was not surprising that while on the stand, Novotny did everything that she could to assist the Debtor in her defense—including answering questions about which she had no personal knowledge and attempting to avoid answering inquiries, the answers to which would undermine the Debtor's defense.[22]

For example, with respect to personal knowledge, on direct examination Novotny testified about her understanding of the terms under which Rainey came to work at the Debtor's firm. [Transcript D4, p. 127, line 1 through p. 128, line 4]. Yet, on cross examination, Novotny admitted that she had no personal knowledge of the Agreement and only knew what her sister, the Debtor, had told her. Her testimony on cross-examination reveals how little she knows about the Agreement:

> Q All right. Is it fair to say that back in the time—well, the time that Mr. Rainey came on board, you didn't really talk to Mr. Rainey about what his deal was with Valorie [i.e. the Debtor] when he came on board. I'm talking about direct—with personal knowledge of discussion with Mr. Rainey about what the deal was?
>
> A That's correct.
>
> Q And if you learned something in that time frame, it came from your sister?
>
> A That's correct.
>
> Q And that's basically true all the way up to about 1998, isn't it?
>
> A Regarding their arrangement?
>
> Q Yes. Your discussions were not with Mr. Rainey. They were with your sister.
>
> A That's probably true.
>
> Q All right.
>
> A I don't recall specifically speaking with Ron about that.
>
> Q And you didn't talk to Ron directly about the assignment, Plaintiff's Exhibit # 1, and I'll put that on the board so that—
>
> Q See that on the screen?
>
> A Yes.
>
> Q It's also in your exhibit book.
>
> A Yes.
>
> Q But you did not talk directly to Mr. Rainey about this document, did you?
>
> A Not when it was signed, no.
>
> Q And you did not help prepare it, did you?
>
> A No, I did not.

---

21. Novotny has since departed from the Debtor's firm and founded her own law firm. [Transcript D5, p. 9, line 21 through p. 10, line 4].

22. Indeed, at one point, Novotny, having been posed a question on redirect by the Debtor, attempted to respond even though she conceded—when questioned by this Court—that she did not understand the question. [Transcript D6, p. 115, line 12 through p. 116, line 6]. While this attempt no doubt reflected Novotny's laudable effort to "move the world" for her sister, the effort further undermined Novotny's credibility in this Court's eyes.

Q And you did not help Ms. Davenport prepare it, did you?

A No I did not.

[Transcript D5, p. 10, line 5 through p. 11, line 12].

Q Yeah. Before you go to that, before I leave Exhibit # 1, you have no personal knowledge of Exhibit # 1 in any manner, shape or form, do you, Ms. Novotny?

A I know that it exists. I know that it was signed, but I don't have any personal knowledge of—

Q The situation around it or anything else?

A Not present, not while it was being signed or negotiated, no.

[Transcript D5, p. 13, lines 15–22].

Another reason why this Court views Novotny's testimony with a large grain of salt is that much of her testimony concerned the expenses associated with the Brio/DOP Litigation; yet, she conceded that "I was not doing specifically the accounting at this time. I was overseeing an accountant we had." [Transcript D4, p. 89, lines 7–12; Transcript D6, p. 108, lines 8–9].[23] Novotny's lack of knowledge about the expense records introduced by the Debtor reflects the very fact that Novotny was *not* heavily involved in keeping the financial books and records of the Debtor's law firm. Indeed, on cross-examination by Rainey's attorney, when asked about Debtor's Exhibit 42—which comprised financial records of the Davenport Law Firm and also a summary prepared by Novotny [Transcript D5, p. 16, lines 20–22] of what the Debtor asserts is an accurate reflection of the Brio/DOP Litigation expenses—No-

votny was unable to provide even slightly convincing testimony that she had command of the information. Attached to this Memorandum Opinion as **Appendix A** are multiple examples—taken from the trial transcript—of Novotny's inability to answer questions about the expense records.

Novotny's credibility is further undermined given her testimony about an expert witness listed in Debtor's Exhibit # 42 setting forth the expenses that the Debtor attributed to the Brio/DOP Litigation. Novotny conceded that this expert witness, the SI Group, Inc., had worked on several cases, including some in which Rainey did *not* have any interest. Yet, when Rainey's counsel asked Novotny whether she, or anyone, had apportioned any of the fees paid to this expert for each of the cases that it worked on, Novotny conceded that she had not. [Transcript D5, p. 57, line 25 through p. 59, line 16]. Thus, the Debtor and her sister, who compiled this exhibit the evening before Novotny's testimony, [Transcript D4, p. 52, line 3 through p. 55, line 15; Transcript D4, line 11 through p. 80, line 2; Transcript D4, p. 99, line 13 through p. 100, line 25], were attempting to maximize the expenses that could be deducted from the Brio/DOP Litigation fees so that under the Debtor's interpretation of the Agreement, Rainey's 15% interest would be minimized. Such a tactic does not sit well with this Court and undercuts Novotny's veracity and credibility.

Finally, and perhaps most telling, Novotny's credibility with this Court was severely damaged by testimony that she gave regarding the calculation of the total expenses that the Debtor contends should

---

**23.** Conspicuous by her absence from the trial was Ms. Sherry Freeman, who was the bookkeeper at the Davenport Law Firm through 1997 or 1998. [Transcript D6, p. 117, lines 3–17]. Also conspicuous by her absence was Ms. Freeman's replacement, an individual named Pat, who worked at the Debtor's law firm until 2003. [Transcript D6, p. 117, lines 18–25]. It appears that these two individuals had the personal knowledge that Novotny lacked regarding the books and records.

be deducted from the total fees generated by the Brio/DOP Litigation to determine if there is a surplus (15% of which Rainey would be entitled to under the Agreement). When Rainey's attorney cross-examined Novotny about the gross fees and gross expenses, Novotny conceded that the gross fees were $6,213,297.72. [Transcript D6, p. 38, line 1 through p. 38, line 20]. Then, with respect to the gross expenses, Rainey's counsel cross-examined Novotny and, in a less than definitively clear exchange, seemed to obtain admissions that the gross expenses were the sum of three figures: $932,117, $1,423,429, and $140,278.[24]

At this point, the Court, to ensure that it understood the Debtor's position on how gross expenses were calculated, had the following exchange with Novotny:

> THE COURT: Let me make sure I understand something, Ms. Novotny. You're saying that what needs to be deducted from the $6,213,297.72 figure is; first $932,117; second $1,423,429; and third, $140,278.
>
> THE WITNESS: I'm saying those are the expenses as we ran them, yes.
>
> THE COURT: All right.
>
> THE WITNESS: And un-reimbursed.
>
> THE COURT: Hold on one second, Mr. Essmyer, I want to make sure I understand what she's saying.
>
> Are there any other expenses other than those three categories?
>
> THE WITNESS: I don't think so, no.
>
> THE COURT: All right. Thank you.
>
> [Transcript D6, p. 41, line 15 through p. 42, line 4].

Novotny's testimony was clear and unequivocal: the gross expenses were the sum of $932,117, $1,423,429 and $140,278— for a gross expense figure of $2,495,824. Yet, when the Debtor took Novotny on redirect, the Debtor attempted to increase this expense total by adducing testimony from Novotny about other expenses apparently not set forth in the Debtor's Exhibits 42, 42A and 52—and Novotny was all too willing to assist in adding to this total. [Transcript D6, p. 124, line 22 through p. 127, line 2]. When this Court reminded Novotny of her testimony earlier in the morning, all she could say was that "I misspoke, your Honor." [Transcript D6, p. 127, lines 3–10].

Novotny is a licensed attorney at law to whom this Court posed two very clear and important questions—and Novotny knew they were important—namely: (1) "You're saying that what needs to be deducted from the $6,213,297.72 figure is; first $932,117.00; second $1,423,429.00; and third, $140,278.00"; and (2) "Are there any other expenses other than those three categories?" Her responses were: (1) "I'm saying those are the expenses as we ran them, yes" and (2) "I don't think so, no." They were emphatic and unequivocal responses and ones which left a strong impression with this Court. For her to change her testimony upon prodding from the Debtor reflects that, at worst, Novotny was not candid with this Court; and, at best, that Novotny does not have sufficient command of the gross expenses of the Brio/DOP Litigation to provide reliable testimony with regard to that issue. Under either interpretation, Novotny's credibility suffers.

All in all, Novotny was not a credible witness, and this Court gives very little weight to her testimony.

---

**24.** The portion of the trial transcript regarding this exchange is set forth in **Appendix B** attached to this Memorandum Opinion.

## IV. HOW MUCH MONEY WAS RAINEY ENTITLED TO UNDER THE AGREEMENT?

At trial, the Debtor testified that under the terms of the Agreement, she owes Rainey nothing; therefore, she argues, no debt to Rainey exists for which a discharge should be denied. This Court disagrees.[25]

This Court finds that under the terms of the Agreement: (a) Rainey was entitled to receive 15% of the difference between gross fees and gross expenses *for each discrete suit in the Brio/DOP Litigation that settled and generated a fee paid to the Davenport Law Firm* on suits for which Rainey provided legal services; and (b) Rainey must *not* wait for every single suit comprising the Brio/DOP Litigation to be completed before he is entitled to receive his 15% share.[26] This Court further finds that the suits in which Rainey provided legal services and that generated fees that were paid to the Debtor's law firm were: (a) the O'Quinn/Brio Litigation; and (b) the Williams/Brio Litigation.[27] The Court makes these findings based upon Rainey's testimony, which was credible; the Debtor's testimony, which was not believable and which contradicted many of her own written statements (as discussed in Section III above); and the three payments which the Debtor actually made to Rainey in September of 1997 totaling $400,000.00, representing approximately 15% of the monies that the Davenport Law Firm received in that month from the Williams Law Firm.

Given these findings, the question is how much Rainey is owed for each suit that settled and generated fees that were paid to the Debtor's Law Firm—i.e. for fees generated and paid to the Debtor's Law Firm from the O'Quinn/Brio Litigation and the Williams/Brio Litigation? There is no dispute, and this Court so finds, that the Debtor paid Rainey three payments totaling $400,000.00 in September.[28] Is Rainey entitled to more?

Even though the Debtor paid Rainey $400,000.00, Rainey is indeed entitled to more under the terms of the Agreement. This Court arrives at this finding first, by determining the amount of gross fees the O'Quinn/Brio Litigation and the Williams/Brio Litigation generated; second, by determining the amount of gross expenses the O'Quinn/Brio Litigation and the Williams/Brio Litigation generated; third, by determining the amount of the surplus after deducting gross expenses from gross fees for the O'Quinn/Brio Litigation and the Williams/Brio Litigation; and fourth, by multiplying the surplus by 15%.

### A. What amount of gross fees was generated and paid to the Davenport Law Firm from the O'Quinn/Brio Litigation and the Williams/Brio Litigation?

Rainey's Exhibit # 4 and the Debtor's Exhibit # 26 are the same document: a one-page document entitled "Settlement Reconciliation" reflecting that the gross fees to which the Davenport Law Firm was entitled from the O'Quinn/Brio Litiga-

---

**25.** The Debtor's argument that she owes Rainey nothing conveniently overlooks the fact that she agreed she owed Rainey a sum certain when she executed the Mediation Settlement Agreement [Rainey's Exhibit No. 22] and the $150,000.00 promissory note. [Rainey's Exhibit No. 23]. Her argument also contradicts the Judgment entered against her in the 2001 Lawsuit. Notwithstanding these

points, this Court believes that it is appropriate to make findings as to how much money the Debtor owed Rainey under the agreement.

**26.** This finding of fact is number 87.

**27.** This finding of fact is number 88.

**28.** This finding of fact is number 89.

tion was $1,165,749.39.[29] In fact, O'Quinn did not pay the amount of $1,165,749.39 to the Debtor's law firm; rather, only $162,514.03 was paid. [FOF No. 15]. The other $1,003,235.36 was not paid because O'Quinn made several deductions for outstanding personal obligations that the Debtor owed to O'Quinn. Rainey had no control over these deductions, and indeed he testified that he never agreed to finance the Debtor's personal expenses. [Transcript D1, p. 258, line 1 through p. 259, line 3]. He is correct that the Agreement contains no such provision. With respect to any other deductions made by O'Quinn—such as reimbursement of expenses totaling $173,301.10 or unresolved items totaling $180,060.06—the Debtor does not escape liability to Rainey merely because O'Quinn made these deductions without the Debtor's consent. She was the sole owner of the Davenport Law Firm [FOF No. 2], and she was the person who entered into the partnership with O'Quinn [FOF No. 10]. If O'Quinn did not live up to whatever arrangement the Debtor negotiated with O'Quinn, she alone, not Rainey, is saddled with that exposure or loss. The Agreement requires the Debtor to pay Rainey 15% of the difference between gross fees and gross expenses relating to the O'Quinn/Brio Litigation. The Court finds that the gross fees figure from the O'Quinn/Brio Litigation is $1,165,749.39.[30]

With respect to the gross fees figure relating to the Williams/Brio Litigation, Rainey's Exhibit # 11 reflects that the Debtor's firm was entitled to $4,577,929.04. Moreover, Rainey's Exhibit # 15 reflects that the Davenport Law Firm actually re-

ceived another $469,619.28 from the Williams Law Firm on July 30, 1998. [FOF No. 45]. The sum of $4,577,929.04 and $469,619.28 is $5,047,548.32. The Court finds that the gross fees figure to use for calculating Rainey's share of the fees from the Williams/Brio Litigation is $5,047,548.32.[31]

The gross fees from the Williams/Brio Litigation, $5,047,548.32, combined with the gross fees from the O'Quinn/Brio Litigation, $1,165,749.39, equals an aggregate amount of $6,213,297.71. The Court finds that the amount of $6,213,297.71 represents the gross fees figure that, under the Agreement, must be used in order to calculate the amount owed by the Debtor to Rainey.[32]

**B. What amount of gross expenses was incurred by the Davenport Law Firm in the O'Quinn/Brio Litigation and the Williams/Brio Litigation?**

The testimony adduced at trial was that three exhibits—Rainey's Exhibit # 11, the Debtor's Exhibit # 42A, and the Debtor's Exhibit # 52A—set forth the gross expenses that the Davenport Law Firm incurred in the O'Quinn/Brio Litigation and the Williams/Brio Litigation. Rainey's Exhibit # 11 is a document entitled "Analysis of Brio Settlement–Fees & Expenses." This document reflects, and this Court so finds, that the sum of the gross expenses associated with the Williams/Brio Litigation was $932,117.10.[33] The Debtor's Exhibits # 42A and 52A reflect, and this Court so finds, that all the gross expenses

---

**29.** The actual fee figure is $1,157,928.75; but this document reflects that O'Quinn owed the Davenport Law Firm reimbursable expenses from this particular litigation of $5,310.13 and accrued interest of $2,510.51. The sum of these three figures is $1,165,749.39.

**30.** This finding is fact is number 90.

**31.** This finding of fact is number 91.

**32.** This finding of fact is number 92.

**33.** This finding of fact is number 93.

associated with the O'Quinn/Brio Litigation, and additional gross expenses associated with the Williams/Brio Litigation, total $1,563,708.53.[34] The sum of $932,117.10 and $1,563,708.53 is $2,495,825.63. The Court finds that the amount of $2,495,825.63 represents the gross expense figure that, under the Agreement, must be used to calculate the amount owed by the Debtor to Rainey.[35]

## C. What is the surplus after deducting gross expenses from gross fees?

The amount of gross fees was $6,213,297.71, and the amount of gross expenses was $2,495,825.63. Subtracting the latter from the former leaves a surplus of $3,717,472.08. This Court therefore finds that the surplus is $3,717,472.08.[36]

## D. What is Rainey's share of the surplus?

Under the Agreement, Rainey is entitled to 15% of the surplus. Because the surplus was $3,717,472.08, Rainey was entitled to $557,620.82. The Debtor only paid him $400,000.00 [FOF No. 88]. This Court

therefore finds that even though the Debtor paid Rainey $400,000.00 in 1997, she still owed him the amount of $157,620.82.[37]

It is worth noting that this $157,620.82 figure tracks closely with the amount for which Rainey settled under the Mediation Settlement Agreement. Specifically, he settled for a note in the amount of $150,000.00.[38] The Debtor, with some difficulty, made thirteen payments on this note, which reduced the principal balance at the time she ceased making payments in September of 2001 [FOF No. 55] to approximately $120,359.13. [FOF No. 73]. Rainey thereafter obtained a judgment against the Debtor in the 2001 Lawsuit for this unpaid principal amount, plus accrued unpaid interest of $16,248.48; plus attorney's fees of $34,151.90; plus post-judgment interest. [FOF No. 73]. By the time the Debtor filed her Chapter 11 petition on June 3, 2003, the amount owed had increased to approximately $171,807.35. It is this $171,807.35 figure, plus the interest that continues to accrue, that this Court must determine is dischargeable or nondischargeable.[39]

---

34. This finding of fact is number 94.

35. This finding of fact is number 95.

36. This finding of fact is number 96.

37. This finding of fact is number 97.

38. He also obtained a promise for payment of another $150,000.00 if fees were ever generated from the Davenport/Brio Litigation, but no such fees were ever forthcoming. The $150,000.00 promissory note related to the remaining fees to which Rainey was entitled from the O'Quinn/Brio Litigation and the Williams/Brio Litigation.

39. Rainey filed a proof of claim in the Debtor's bankruptcy case for the amount of $321,807.35. [FOF No. 77]. This figure represented the sum of $171,807.35 plus the $150,000.00 that might still be paid to Rainey if the Davenport/Brio Litigation generated

fees. At the time that he filed this proof of claim (September 30, 2003), the Davenport/Brio Litigation was not yet over, so there was still a possibility that this particular litigation would generate fees for the Davenport Law Firm, thereby causing Rainey to receive the $150,000.00 that the Debtor had agreed to pay to him under the Mediation Settlement Agreement. However, the plaintiffs in the Davenport/Brio Litigation eventually were unsuccessful, and therefore Rainey will not receive any amount from these suits. Thus, the foregone amount of $150,000.00 will be subtracted from the proof of claim figure of $321,807.35 to determine the amount of the claim that Rainey requested this Court to determine is nondischargeable. This amount is $171,807.35 (i.e.$321,807.35—$150,000.00).

In passing, this Court notes that the figure of $171,807.35 appears to be a lower figure than should be the case based upon the interest rate of 18% per annum set forth in the

## V. CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

This Court has jurisdiction pursuant to 28 U.S.C. § 157(b)(2)(I) and § 1334(b). The Complaint to Determine Dischargeability of Debt is an adversary proceeding pursuant to Bankruptcy Rule 7001. Venue is proper pursuant to 28 U.S.C. § 1409(a).

### B. Burden of Proof

■ Whether Rainey's claim is dischargeable hinges on the application of 11 U.S.C. § 523(a)(4) and (a)(6) [40] to the Debtor's behavior that gave rise to the claim. The Debtor argues that in evaluating Rainey's arguments, the Court must be persuaded by clear and convincing evidence. [Transcript D3, p. 8, lines 7–10]. The Debtor is wrong. In 1991, the United States Supreme Court unequivocally held that the standard of proof for the discharge exceptions under § 523(a) is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). This Court finds that Rainey has met this burden of proof with respect to embezzlement under § 523(a)(4) and willful and malicious injury under § 523(a)(6).

### C. Res Judicata and Collateral Estoppel

■ The preclusive effect of a state court judgment in a subsequent federal lawsuit is determined by the full faith and credit statute. State judicial proceedings "shall have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738. This statute "commands a federal court to accept the rules chosen by the State from which the judgment is taken." *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) (citing *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 481–82, 102 S.Ct. 1883, 72 L.Ed.2d 262 (1982)); *accord Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 373, 116 S.Ct. 873, 134 L.Ed.2d 6 (1996); *In re Gober*, 100 F.3d 1195, 1201 (5th Cir.1996) (discussing preclusive effect of state judgment in bankruptcy proceedings). Consequently, since the Judgment was rendered by a Texas state court, this Court must apply Texas law in determining the preclusive effect of the Judgment. *In re Miller*, 156 F.3d 598, 601–02 (5th Cir.1998); *In re Hayden*, 248 B.R. 519, 523 (Bankr.N.D.Tex.2000).

■ Although courts sometimes use the terms interchangeably, the terms "res judicata" and "collateral estoppel" refer to two different concepts. *In re Gober*, 100 F.3d, at 1200 n. 2 (noting that res judicata is the effect of a prior judgment on claims that should have been but were not argued in a lawsuit; collateral estoppel bars reliti-

Judgment. At the time the Judgment was rendered on March 7, 2003, the amount for which the Debtor was liable was $170,759.51 (the sum of $120,359.13 plus $16,248.48 plus $34,151.90). *The Debtor filed her Chapter 11 petition on June 3, 2002, which was 88 days after the Judgment was rendered.* Therefore, the amount of the Judgment—$170,759.51— accrued interest at the per annum rate of 18% for 88 days. The amount of this accrued interest was $170,759.51 × (88 days/365 days) × 18% or $7,410.49. The sum of $170,759.51 plus $7,410.49 is $178,170.00,

and it is this amount which Rainey was owed on the date of the filing of the Debtor's bankruptcy petition (excluding the $150,000.00 that might have been paid from the Davenport/Brio Litigation). Why Rainey claimed $171,807.35 rather than $178,170.00 is unclear to this Court. Because Rainey filed for the lower figure, this Court accepts this figure for purposes of this adversary proceeding.

**40.** Unless otherwise noted, all section references shall be to 11 U.S.C., also known as the Bankruptcy Code.

gation of issues that have already been litigated and decided). Res judicata, or claim preclusion, "prevents the relitigation of a claim or cause of action that has been finally adjudicated." *Id.; Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 628 (Tex. 1992). Collateral estoppel, or issue preclusion, "prevents relitigation of particular issues already resolved in a prior suit." *Id.; see also Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984).

As long ago as 1849, the Texas Supreme Court held that res judicata "is not only final as to the matter actually determined, but as to every other matter which the parties might litigate in the cause, and which they might have had decided." *Foster v. Wells*, 4 Tex. 101, 104 (1849). In fact, that court further held that *res judicata* applies to matters that "were or could have been adjudicated." *Id.* In 1992, the Texas Supreme Court affirmed its earlier holding and even more explicitly stated that any subsequent suit would be precluded if the claim arises out of the same subject matter that, with due diligence, "could have been litigated in a prior suit." *Barr v. Resolution Trust Corp.*, 837 S.W.2d at 631; *see also Jeanes v. Henderson*, 688 S.W.2d 100, 103 (Tex.1985) (res judicata bars not only what was litigated but also any claims that could have been litigated).

■ The amount in question in this adversary proceeding—$171,807.35—arises out of the Debtor's initial oral promise to pay Rainey, later memorialized in the Agreement [FOF No. 20], then reduced to a specific amount in the Mediation Settlement Agreement [FOF No. 49], and further set forth in the Judgment. [FOF No. 73]. In the 1998 Lawsuit, Rainey sued the Debtor for breach of the Agreement and later, in the 2001 Lawsuit, sued the Debtor for breach of the Mediation Settlement Agreement and the related promissory note. [FOF Nos. 44 and 58]. That the Debtor owes Rainey this sum is no longer in question; the Judgment conclusively settled this issue and, notwithstanding any appeal,[41] it is not to be relitigated.

■ The Debtor, however, argues that res judicata does not apply until a debtor has exercised her appellate remedies; and because the Debtor filed a Chapter 11 petition, she contends that she has not yet availed herself of the right to appeal the Judgment in the state appellate courts; therefore, res judicata is inapplicable. [Transcript D2, p. 262, lines 13–16; Defendant Debtor's Response to Plaintiff's Motion for Summary Judgment and Response to Motion for Sanctions at page 13]. The Debtor is correct only if the original judgment is interlocutory; a final judgment on the merits is entitled to a preclusive effect. *In re Gober*, 100 F.3d at 1201. In 1986, the Texas Supreme Court overruled ninety-three years of settled Texas law to specifically "hold that a judgment is final for the purposes of issue and claim preclusion 'despite the taking of an appeal unless what is called an appeal actually consists of a trial *de novo.*'" *Scurlock Oil Co. v. Smithwick*, 724 S.W.2d 1, 6 (Tex. 1986) (quoting *Restatement (Second) of Judgments* § 13 (1982); overruling *Texas Trunk Ry. Co. v. Jackson*, 85 Tex. 605, 22 S.W. 1030 (1893)). Thus, Texas law now follows the established rule in federal courts "that a final judgment retains all of its res judicata consequences pending decision on appeal." *Id.* In the adversary proceeding at bar, the Judgment is final; the fact that the Debtor did not exercise her appellate remedies prior to her bank-

---

41. The Debtor has not yet appealed the Judgment. After her motion for a new trial was denied, the Debtor filed her Chapter 11 petition. [FOF Nos. 74, 75, and 76].

ruptcy filing does not mean that *res judicata* is inapplicable. This principle is applicable here, and the Debtor may not argue otherwise.

 Notwithstanding that the Judgment is final and valid, the newly raised matter before this Court is the issue of dischargeability of this debt. Since 1970, the issue of dischargeability has been a matter of federal law governed by the Bankruptcy Code and to be decided by the bankruptcy court. *Brown v. Felsen*, 442 U.S. 127, 129–130, 138, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). Nondischargeability is "independent of the issue of the validity of the underlying claim." *Grogan v. Garner*, 498 U.S. at 289, 111 S.Ct. 654. In the proceeding at bar, not only was dischargeability not decided at the state level, it could not have been decided. The Fifth Circuit has pointed out that "Congress intended to give the bankruptcy court exclusive jurisdiction to determine bankruptcy dischargeability issues." *In re Shuler*, 722 F.2d 1253, 1254 (5th Cir.1984). In fact, in *Brown v. Felsen*, the United States Supreme Court held that the creditor "does not assert a new ground for recovery . . . Rather, what he is attempting to meet here is the new defense of bankruptcy which respondent [the debtor] has interposed between petitioner [the creditor] and the sum determined to be due him." 442 U.S. at 133, 99 S.Ct. 2205. The Supreme Court further said that with respect to deceit, fraud and malicious conversion, "these questions are now, for the first time, squarely in issue . . . [t]hey are the type of questions Congress intended that the bankruptcy court would resolve." *Id.* at 138, 99 S.Ct. 2205.

 Consequently, the Fifth Circuit has held that in determining dischargeability where a state court judgment evidencing a debt has been rendered, a bankruptcy court is not bound by such judgment and, therefore, res judicata does not bar the court from receiving evidence by which it can discern the character of and, hence, the dischargeability of the debt. *In re Shuler*, 722 F.2d at 1255 (citing *Carey Lumber v. Bell*, 615 F.2d 370, 377 (5th Cir.1980)). The United States Supreme Court has clarified that collateral estoppel may apply in § 523(a) discharge exception proceedings. *Grogan v. Garner*, 498 U.S. at 284, n. 11, 111 S.Ct. 654. However, the converse is also true: subsidiary facts necessary to determining dischargeability "that have not been actually and necessarily litigated or that are not discernible from the record, must also be determined by it [the bankruptcy court] after hearing all relevant evidence . . . ." *In re Shuler*, 722 F.2d at 1256, (citing *Franks v. Thomason*, 4 B.R. at 814, 820–21 (N.D.Ga.1980)); *see also In re Poston*, 735 F.2d 866, 869 (5th Cir.1984) (bankruptcy court properly found that the record did not contain sufficient facts to support the conclusory recitals in the state court judgment).

 The rule in the Fifth Circuit is that "an issue is 'actually litigated' only when it is properly raised by the pleadings, submitted for a determination, and actually determined." *In re Gober*, 100 F.3d at 1203 (citing *In re Garner*, 56 F.3d 677, 680 (5th Cir.1995)). In the adversary proceeding at bar, Rainey filed the 2001 Lawsuit requesting judgment against the Debtor for breach of contract for failure to make payments to him under the Mediation Settlement Agreement and the related promissory note. [FOF No. 58]. The Debtor filed a general denial, various motions, and her First Amended Original Answer, and she alleged some affirmative defenses, but she did not appear at the March 7, 2003, trial [FOF Nos. 59, 62, 63, 65, 67, 68, 72 and 73]; consequently, the Judgment was rendered solely on Rainey's Motion for Summary Judgment [FOF No.

73]. Since Rainey did not raise the issue of the underlying character of the debt in the 2001 Lawsuit, the nature of the Debtor's actions with respect to the debt were not submitted for determination by that state court and, hence, were not decided. Therefore, this Court appropriately held a trial to receive evidence to determine facts sufficient to discern whether Rainey's claim is nondischargeable under 11 U.S.C. § 523(a).

### D. Novation and Underlying Character of Rainey's Claim

 The Debtor argues that because Rainey seeks to enforce the amount of a money judgment, he is bound by the character of that same judgment. Her argument hinges upon the idea that regardless of the behavior that gave rise to the debt, once the debt was settled by way of mediation, the debt took on the character of the contract which resulted from the settlement. In short, the Debtor argues that the debt underwent a form of novation so that after settlement, the debt lost its antecedents and became purely a contractual matter. Thus, the Debtor contends, the 2001 Lawsuit became merely an action for breach of contract; the Judgment was rendered on such breach; and this Court is now barred from looking behind the Judgment to inquire into the original nature of the debt. [Defendant Debtor's Response to Plaintiff's Motion for Summary Judgment and Response to Motion for Sanctions at pages 17–18]. The Debtor has misread the law.

Twenty-six years ago the United States Supreme Court addressed this very issue under § 17a(2) and (4) of the Bankruptcy Act of 1898 [42], the predecessor to current Bankruptcy Code § 523(a)(4) and (a)(6) with which this adversary proceeding is concerned. With respect to a debt allegedly incurred by fraud and later settled by stipulation, the Supreme Court held that the bankruptcy court is not limited to reviewing the underlying state court judgment and record but should look behind the stipulation to determine whether the creditor had a valid claim for fraud. *Brown v. Felsen*, 442 U.S. at 138–139, 99 S.Ct. 2205. By inquiring into the legislative history of Bankruptcy Act § 17, the Supreme Court was able to elucidate Congress' intent "that all debts arising out of conduct specified in § 17 should be excepted from discharge and the mere fact that a conscientious creditor has previously reduced his claim to judgment should not bar further inquiry into the true nature of the debt." *Id.* at 138, 99 S.Ct. 2205.

In 2003, the Supreme Court once again addressed this issue; this time, under Bankruptcy Code § 523(a). In a case similar to the one at bar, the Supreme Court reaffirmed its holding in *Brown* and held that a debt embodied in the settlement of a fraud case arises out of the underlying fraud. *Archer v. Warner*, 538 U.S. 314, 321, 123 S.Ct. 1462, 155 L.Ed.2d 454 (2003). The Supreme Court concluded that the settlement agreement may have worked a type of novation but that such circumstances would not bar the claimants from showing that the settlement debt

---

**42.** § 17a of the Bankruptcy Act of 1898 provided for the types of debts not dischargeable in bankruptcy. These were substantially similar to those under Bankruptcy Code § 523(a) and included under § 17a(2) "liabilities for obtaining money or property by false pretenses or false representations ... or for willful and malicious conversion of the property of another." § 17a(4) included debts that "were created by ... [the debtor's] fraud, embezzlement, misappropriation, or defalcation while acting as an officer or in any fiduciary capacity." *See Brown v. Felsen*, 442 U.S. 127, 129, 99 S.Ct. 2205, 60 L.Ed.2d 767 including n. 1 (1979).

arose out of conduct blocking discharge under § 523(a). *Id.* at 323, 123 S.Ct. 1462.

The Debtor, aware of the holdings in *Brown* and *Archer*, nonetheless argues, as discussed above, that the intervening Mediation Settlement Agreement should preclude this Court from considering the original character of Rainey's claim. In so doing, the Debtor relies solely on the dissent in *Archer* and her sense that the majority's opinion produces an unfair result.[43] Her position cannot stand. The United States Supreme Court's decisions, first in *Brown* and then in *Archer*, make it incumbent upon this Court to inquire into the nature of the actions of the parties out of which Rainey's claim arose; and this, the Court has done.

## E. Sections 523(a)(4) and (6) of the Bankruptcy Code

A Chapter 7 discharge under Bankruptcy Code § 727 does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, for embezzlement, or for larceny; or for willful and malicious injury by the debtor to another entity. 11 U.S.C. § 523(a)(4) and (6). Rainey alleges that his claim against the Debtor falls within either or both of these sections; the Debtor vehemently disagrees.

### 1. Did the Debtor commit fraud or defalcation while acting in a fiduciary capacity?

The United States Supreme Court long ago stated that the general purpose of bankruptcy law is to give "the honest but unfortunate debtor ... a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt." *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) (citations omitted); *accord Lines v. Frederick,* 400 U.S. 18, 19, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970), *In re Angelle,* 610 F.2d 1335, 1339 (5th Cir.1980). To facilitate this general policy of allowing the debtor to make a fresh start[44], it is "a well-established principle that exceptions to discharge should be limited to those clearly expressed in the statute." *In re Angelle,* 610 F.2d at 1339 (citing *Gleason v. Thaw,* 236 U.S. 558, 562, 35 S.Ct. 287, 59 L.Ed. 717 (1915)). Although originally written with respect to the Bankruptcy Act of 1898, the Fifth Circuit has expressly applied these principles to the Bankruptcy Code. *In re Boyle,* 819 F.2d 583, 588–589 (5th Cir. 1987). As a result, the Fifth Circuit has found that the plain language of § 523(a)(4) and a reading of the limited record of congressional intent indicate that the discharge exceptions thereunder only apply to "debts incurred through abuses of fiduciary positions and through active misconduct whereby a debtor has deprived others of their property by criminal acts." *Id.* at 587–588; *accord In re Miller,* 156 F.3d at 602. In other words, by way of fraud or a crime.

The phrasing of § 523(a)(4) makes it clear that for a debt to be nondischargeable due to fraud or defalcation, the debtor must have owed the claimant a fiduciary duty. Between 1844[45] and 1934, the United States Supreme Court ad-

---

**43.** The Debtor references *Archer* in her Response to Rainey's Motion for Summary Judgment, argues against the majority holding, and espouses the dissent's position.

**44.** *In re Boyle,* 819 F.2d 583, 588 (5th Cir. 1987).

**45.** The Bankruptcy Act of 1841 contained a provision similar to § 17a(4) of the Bankruptcy Act of 1898, which itself is similar to § 523(a)(4). *In re Angelle,* 610 F.2d at 1338.

dressed and refined the concept of a fiduciary with respect to nondischargeability of debts. The concept of a fiduciary is to be narrowly construed so that the duty must arise out of a technical trust and not from a relationship which the law implies from the related contract. *Chapman v. Forsyth*, 43 U.S. 202, 207, 2 How. 202, 11 L.Ed. 236 (1844). In addition, such technical trust and resultant fiduciary duty must exist prior to the creation of the debt and without reference to the debt. *Upshur v. Briscoe*, 138 U.S. 365, 378, 11 S.Ct. 313, 34 L.Ed. 931 (1891); *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934).

The Fifth Circuit has explained that a technical trust is also called an express trust and that "a constructive trust is not sufficient to create a fiduciary relationship for purposes of the discharge provisions of the Bankruptcy Act." *In re Bennett*, 989 F.2d 779, 784 (5th Cir.1993) (citing *Chapman v. Forsyth*, 43 U.S. at 207; *In re Angelle*, 610 F.2d at 1335). Further, following *Upshur*, the express trust must have been in existence prior to any wrong doing and "[t]he debtor must have been a trustee before the wrong and without any reference to it." *Id.* at 784 (citing *Upshur v. Briscoe*, 138 U.S. at 378, 11 S.Ct. 313; *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir.1986)).

Although the concept of fiduciary under § 523(a)(4) is a question of federal law, "state law is important in determining whether or not a trust obligation exists." *Id.*, citing *In re Angelle*, 610 F.2d at 1339. Today, most courts recognize that an express trust can arise not only via a formal trust agreement but also through obligations imposed by statute or common law. *Id.*, at 785. For example, an officer of a corporation owes a common law fiduciary duty to both the corporation and stockholders. *Id.* (citing *Moreno v. Ash-*

*worth*, 892 F.2d 417, 421 (5th Cir.1990)). Or, by way of another example, the Oklahoma Lien Trust statutes create an express trust which gives rise to a fiduciary duty under § 523(a)(4). *Id.* at 785 (citing *Carey Lumber Co. v. Bell*, 615 F.2d 370, 374 (5th Cir.1980)).

Thus, the seminal question with respect to fraud or defalcation is: under Texas law involving express trusts, did the debtor owe the claimant a preexisting fiduciary duty? In the proceeding at bar, was the Debtor a trustee with respect to Rainey at the time of their original oral agreement? If the answer is in the negative, then it is of no moment if the Debtor's actions constituted fraud or defalcation.

In Texas, "[f]iduciary duties arise as a matter of law in certain formal relationships, including attorney-client, partnership, and trustee relationships." *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex.1998) (citations omitted). Clearly, the Debtor and Rainey did not share an attorney-client relationship. Nor did the Debtor stand in a formal trustee relationship with Rainey.

Neither a partnership nor a joint venture is established solely by an agreement to share net fees such as that which existed between the Debtor and Rainey. *Ben Fitzgerald Realty Co. v. Muller*, 846 S.W.2d 110, 120 (Tex.App.-Tyler 1993, writ denied). Instead, both a partnership and a joint venture require the same four essential elements, with a joint venture usually being limited to one particular enterprise. *Id.* (citing *State v. Houston Lighting & Power Co.*, 609 S.W.2d 263 (Tex.Civ.App.-Corpus Christi 1980, writ ref'd n.r.e.); *N. Tex. Lumber Co. v, Kaspar*, 415 S.W.2d 470 (Tex.Civ.App.-Dallas 1967, writ ref'd n.r.e.)). These four elements are: (1) a community of interest in the venture; (2) an agreement to share

profits; (3) an agreement to share losses; and (4) a mutual right of control or management of the enterprise. *Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 176 (Tex.1997) (citing *Coastal Plains Dev. Corp. v. Micrea, Inc.,* 572 S.W.2d 285, 287 (Tex.1978)). The Debtor and Rainey had a community of interest in the Brio/DOP Litigation insofar as they were to split net fees in an 85%/15% ratio. [FOF Nos. 7 and 20]. However, the Agreement did not provide for Rainey to share in any losses, nor was there any evidence introduced indicating that Rainey had any right to control or manage the enterprise, i.e., the Brio/DOP Litigation. In fact, the Debtor precluded Rainey from being involved in discussions with O'Quinn and Williams regarding their respective deductions from the fees owed to the Davenport Law Firm [FOF Nos. 15 and 30]; and Rainey was unable to obtain an accounting of receipts from the Debtor [FOF Nos. 15 and 30]. Consequently, this Court finds that there was neither an express nor implied partnership or joint venture between the Debtor and Rainey. *See id.* Therefore, no partnership was created between the Debtor and Rainey; and, accordingly, no fiduciary relationship existed between these two persons.

 The Texas Supreme Court has also recognized informal fiduciary relationships. However, "not every relationship involving a high degree of trust and confidence rises to the stature of a fiduciary relationship." *Id.* at 176–77 (citing *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.,* 823 S.W.2d 591, 594 (Tex. 1992)). Further, such relationship must exist before, and independent of, the agreement out of which the controversy arose. It is also important to note that "mere subjective trust [by one party on another] does not, as a matter of law, transform arm's-length dealing into a fiduciary rela-

tionship." *Id.* Therefore, any fiduciary relationship that could possibly have existed between the Debtor and Rainey could not have arisen out of the Agreement. In addition, it is highly likely that under the narrower federal common law defining a fiduciary under § 523(a)(4), an informal fiduciary relationship would not rise to the level of an express trust. *See In re Miller,* 156 F.3d at 602.

 The Debtor's original and ongoing relationship with Rainey was that of an employer to employee. [FOF No. 8]. A fiduciary relationship is one that requires good faith and fair dealing. *See Banner Life Ins. Co. v. Pacheco,* 154 S.W.3d 822, 831 (Tex.App.-Houston [14th Dist.] 2005, no. pet. h.). However, the Texas Supreme Court has "decline[d] to impose a duty of good faith and fair dealing on employers." *City of Midland v. O'Bryant,* 18 S.W.3d 209, 216 (Tex.2000). As a result, the overarching relationship between the Debtor and Rainey, as employer and employee, did not impose a fiduciary duty on her.

 Nonetheless, Rainey argues that Texas Disciplinary Rule of Professional Conduct (the Disciplinary Rules) 1.14 required the Debtor to safeguard and maintain in a separate account funds received on his behalf from the Brio/DOP Litigation. Disciplinary Rule 1.14 provides in pertinent part:

(a) A lawyer shall hold funds and other property belonging in whole or in part to clients or third persons that are in a lawyer's possession *in connection with a representation* separate from the lawyer's own property. Such funds shall be kept in a separate account . . . .

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person . . . . a lawyer shall promptly deliver to the client or third person any funds

or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) *When in the course of representation* a lawyer is in possession of funds or other property in which both the lawyer and other person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interest . . .

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.14, *reprinted in* TEX. GOVT.CODE ANN., tit. 2, Subt. G app. A, Art. 10, § 9, Rule 1.14 (Vernon 2005) (TEX. STATE BAR R. art. X, § 9) (emphasis added).

This Rule and its attendant comments are located in the client-lawyer section of the Disciplinary Rules and, consequently, relate primarily to a lawyer's relationship with her clients. Comment 3 to Disciplinary Rule 1.14 provides that "[t]hird parties, such as client's creditors, may have just claims against funds or other property in a lawyer's custody." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.14 cmt. 3. To the extent that this rule relates to non-clients, Comment 3 implies that funds are to be held in trust for those persons with claims on the client's money. This interpretation is supported by the modest case law related to this particular Disciplinary Rule. *See, e.g., Butler v. Comm'n for Lawyer Discipline*, 928 S.W.2d 659 (Tex.App.-Corpus Christi 1996) (holding that an attorney violated Disciplinary Rule 1.14 by not maintaining workers' compensation settlement funds in a separate account until his client's other attorney was paid or the dispute resolved); *State ex rel. Okla. Bar Ass'n. v. Taylor*, 71 P.3d 18 (Okla.2003) (finding that an attorney violated Oklahoma Rule of Professional Conduct 1.15 [equivalent to Texas Disciplinary Rule 1.14] by disbursing disputed client settle-

ment funds to himself, client's other attorney and medical providers). In both of these cases, the client's "other attorney" provided services separate and apart from the attorney in control of the settlement funds. Thus, it was the client, not the attorney in control, who owed a fee to the "other attorney." Conversely, in this proceeding, the Debtor, not a client, directly owes Rainey his proportionate share of the fees as compensation for services rendered as her employee.

Related Comment 4 provides that:

The obligations of a lawyer under this Rule are independent of those arising from activity other than rendering legal service. For example, a lawyer who serves as an escrow agent is governed by the applicable law relating to fiduciaries even though the lawyer does not render legal services in the transaction.

Tex. Disciplinary R. Prof'l Conduct 1.14 cmt.4.

This Comment indicates that the nature of a lawyer's obligation is governed by the underlying nature of the transaction. In this instance, the Debtor received the funds as fees for work done by her firm on the Brio/DOP Litigation. [FOF Nos. 15, 26, 29 and 45]. Her obligation to Rainey was that of an employer to an employee of her law firm. [FOF No. 8]. Consequently, the Debtor only owed Rainey the duty to pay him his contractually agreed share of the fees as compensation. As an employer, the Debtor did not owe Rainey any fiduciary duty with respect to those fees.

Finally, even if Disciplinary Rule 1.14 could be otherwise found to impose a fiduciary duty on the Debtor with respect to monies received from the Brio/DOP Litigation and due to be paid to Rainey, Paragraph 15 to the Preamble to the Disciplinary Rules makes it quite clear that the Disciplinary Rules are not to be used as the basis for a private cause of action.

Paragraph 15 reads, in pertinent part, as follows:

15. These rules do not undertake to define standards of civil liability of lawyers for professional conduct. *Violation of a rule does not give rise to a private cause of action* .... Likewise, these rules are not designed to be standards for procedural decisions. Furthermore, the purpose of these rules can be abused when they are invoked by opposing parties as procedural weapons. The fact that a rule is a just basis for a lawyer's self-assessment, or for sanctioning a lawyer under the administration of a disciplinary authority, does not imply that an antagonist in a collateral proceeding or transaction has standing to seek enforcement of the rule. Accordingly, *nothing in the rules should be deemed to augment any substantive legal duty of lawyers* or the extra-disciplinary consequences of violating such a duty.

Tex. Disciplinary R. Prof'l Conduct preamble ¶ 15 (emphasis added).

The highlighted language indicates that if the Debtor does not independently owe Rainey a fiduciary duty, the Disciplinary Rules do not impose such a duty upon her. *See Judwin Props., Inc. v. Griggs & Harrison, P.C.*, 981 S.W.2d 868, 870 (Tex.App.-Houston [1st Dist.] 1998, pet. denied). If Rainey believes that the Debtor has violated Disciplinary Rule 1. 14, his recourse is to file a grievance against her.

 This Court is cognizant of the fact that the Debtor owed Rainey a contractual obligation to pay him the agreed upon portion of the Brio/DOP fees. That she did not do so when she had the monies in hand, at best, speaks poorly of her judgment. Nonetheless, after carefully scrutinizing the law, it is clear that the Debtor did not owe Rainey a fiduciary duty with respect to such funds and, therefore, it is irrelevant whether her actions constituted fraud or defalcation. Hence, that portion of Bankruptcy Code § 523(a)(4) does not prevent the discharge of Rainey's claim against the Debtor.

## 2. Did the Debtor commit larceny or embezzlement?

 The Bankruptcy Code specifically provides for the nondischargeability of any debt incurred by embezzlement or larceny. 11 U.S.C. § 523(a)(4). Unlike fraud and defalcation, if the debt is incurred by commission of either embezzlement or larceny, the debtor need not have been acting in a fiduciary capacity. *In re Boyle*, 819 F.2d 583, 587, n. 9 (5th Cir.1987); *see also In re Miller*, 156 F.3d 598, 602 (5th Cir.1998); *In re Littleton*, 942 F.2d 551, 555 (9th Cir.1991).

 For purposes of § 523(a)(4), federal law controls the meaning of larceny and embezzlement. *In re Hayden*, 248 B.R. 519, 525 (Bankr.N.D.Tex.2000); *In re Brady*, 101 F.3d 1165,1172–73 (6th Cir. 1996); *In re Littleton*, 942 F.2d at 555. Both larceny and embezzlement involve the fraudulent appropriation of another's property; they differ only in timing. Larceny applies when a debtor unlawfully appropriates property at the outset, whereas embezzlement applies when a debtor unlawfully appropriates property after it has been entrusted to the Debtor's care. *See In re Miller*, 156 F.3d at 602; *In re Patton*, 129 B.R. 113, 117 (Bankr.W.D.Tex. 1991). In the proceeding at bar, since the Debtor lawfully came into possession of the fees from the Brio/DOP Litigation, the Debtor could not have committed larceny as a matter of law. Therefore, Rainey's claim cannot be nondischargeable under a larceny theory.

 Is the claim nondischargeable under an embezzlement theory? In 1895, the

United States Supreme Court defined embezzlement as "the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Moore v. United States*, 160 U.S. 268, 269, 16 S.Ct. 294, 40 L.Ed. 422 (1895). This exact phrase has been adopted by numerous courts with respect to § 523(a)(4), including the Fifth Circuit. *In re Miller*, 156 F.3d at 602. Given that a debtor has lawful control of the property, embezzlement then requires three elements: (1) appropriation of funds by the debtor; (2) for the debtor's use or benefit; and (3) with fraudulent intent. *See e.g., In re Hayden*, 248 B.R. at 525; *In re Patton*, 129 B.R. at 116; *In re Beckett*, 96 B.R. 366, 368 (Bankr.M.D.Fla.1989); *In re Harrell*, 94 B.R. 86, 91 (Bankr.W.D.Tex.1988); *In re Koelfgen*, 87 B.R. 993, 997 (Bankr. D.Minn.1988). *See also In re Miller*, 156 F.3d at 602–03.

■ To "appropriate" is to exercise control over or take possession of property. *In re Hayden*, 248 B.R. at 525 (citing *Black's Law Dictionary* 98 (7th ed.1999)). There is no question that the Debtor exercised complete control over fees her law firm received from the Brio/DOP Litigation. [FOF Nos. 15, 17, 26, 29 and 31]. There is also no question that some portion of such fees belonged to Rainey, i.e. fifteen percent of the fees after expenses directly related to those discrete suits comprising the Brio/DOP Litigation where (a) net fees were paid to the Davenport Law Firm, and (b) Rainey worked on the suit. [Admission No. 5; Transcript D1, p. 16, lines 23–25; and FOF Nos. 20, 39, 85, and 86]. All checks were made payable to the Debtor's law firm and were deposited into her law firm's operating account. [FOF Nos. 26, 29 and 45]. Except for the monies which she paid Rainey—which was insufficient under the Agreement—the Debtor expended all monies for her own purposes either as general operating expenses of her law firm or for her personal use. [FOF Nos. 15, 38 and 39]. The $157,620.82 which the Debtor failed to pay Rainey is the amount that she appropriated for her own use. [FOF No. 94]. For these reasons, the first and second elements establishing embezzlement are satisfied.

■ The remaining question is whether the Debtor appropriated this $157,620.80 for her own use with fraudulent intent? An intent to defraud can be said to be an intent to deceive another person and thereby induce such other person to transfer, alter or terminate a right with respect to property. *In re Harrell*, 94 B.R. at 91; (citing *In re Brinsfield*, 78 B.R. 364, 370 (Bankr.M.D.Ga.1987)). Fraudulent intent may be proved by circumstantial evidence. *In re Brady*, 101 F.3d 1165, 1173 (6th Cir.1996); *In re Buhay*, 77 B.R. 561, 565 (Bankr.W.D.Tex. 1987) (citing *United States v. Powell*, 413 F.2d 1037, 1038 (4th Cir.1969)); *see also Roberts v. United States*, 151 F.2d 664, 665 (5th Cir.1945). Since fraud thrives in the shadows, a debtor who acts openly, without any attempt at concealment, and whose actions can be clearly seen, can negate fraudulent intent. *In re Harrell*, 94 B.R. at 91 (citing *In re Myers*, 52 B.R. 901, 905 (Bankr.E.D.Va.1985)); *see also In re Stern*, 231 B.R. 25, 26 (S.D.N.Y.1999) (affirming the Bankruptcy Court's finding of larceny where the debtor's actions were "done surreptitiously, without the knowledge and without the consent of" the creditor).

■ The Honorable Larry E. Kelly, Chief Judge for the United States Bankruptcy Court for the Western District of Texas, has found embezzlement where the debtor was aware that the creditors wanted their funds to be returned and the

debtor expended such funds without accounting for them. *In re Buhay,* 77 B.R. at 565. Following Judge Kelly's reasoning, The Honorable Robert C. McGuire, the former Chief Judge of the United States Bankruptcy Court for the Northern District of Texas, elucidated, and on appeal, The Honorable United States District Judge Sam A. Lindsay blessed a four-part test for determining fraudulent intent: (1) whether the debtor alone had access to the creditor's money; (2) whether the debtor had knowledge that the creditor wanted his money returned; (3) whether the debtor had accounted to the creditor for the funds; and (4) whether an accounting had been made for the funds. *Pool v. Johnson,* No. 3:01–CV–1168L, 2002 WL 598447, 2002 U.S. Dist. LEXIS 6613 (N.D. Tex. April 15, 2002).

Applying this objective test to the Debtor's actions, the conclusion is inescapable that the Debtor acted with fraudulent intent. Settlement fees from the Brio/DOP Litigation were paid directly to the Debtor or her law firm, and she deposited them into her law firm's operating account.[46] [FOF Nos. 26, 29]. The Debtor's testimony was that she did so because "[i]t was just my fees." [FOF No. 29]. Once the funds were in the operating account, the Debtor used the money as she saw fit for law firm expenses, personal expenses and, at times, to pay Rainey. [FOF Nos. 15, 26, 29, 38 and 39]. Yet, the Debtor has made the judicial admission that even as she used these monies for other purposes, she knew that Rainey had a legal interest in them. [FOF No. 39].

Moreover, while she was disbursing the settlement fees to herself, the Debtor was aware that Rainey wanted his share of the Brio/DOP Litigation fees paid to him.

Certainly, in 1996, by the time the Debtor wrote her August 14 letter and received Rainey's September 20 response, the Debtor knew that Rainey wanted and expected the Debtor to pay him all fees that she had promised him. [FOF Nos. 17, 18 and 19]. Regardless, the Debtor did not pay Rainey any money related to the November 1996 check in settlement of the O'Quinn/Brio Litigation. [FOF Nos. 15, 16 and 17]. Later, in September 1997, when the Williams/Brio Litigation settled, Williams calculated that the Davenport Law Firm's share of the fee was over $4.5 million. [FOF No. 25]. However, the Debtor paid Rainey a total of $400,000.00 in three payments during September 1997 and thereafter made it clear to him that she would not be paying him any more money. [FOF Nos. 26, 28, 31 and 40].

As to the third and fourth tests, the Debtor did not account to Rainey for the funds her firm actually received, and should have received, from O' Quinn and Williams; nor has she ever provided Rainey or this Court with an accurate and complete accounting of how the funds her firm did receive were spent. [FOF Nos. 15, 30, and 42]. Indeed, it is this failure to account for the gross settlement receipts and the directly related expenses which most clearly indicate the Debtor's fraudulent intent. A debtor with open and clear intentions would not need to hide behind vague, general statements about high, unexpected expenses. Instead, she would merely account for receipts, directly related expenses, and then payments.

 As to the Debtor's explanation of her use of fees for purposes other than to pay Rainey, the Debtor alleges that she needed the funds to pay ongoing overhead

---

46. The Debtor and her sister had access to this account; Rainey did not. [Transcript D5, p. 16, lines 9–12].

expenses at her law firm. [FOF No. 40]. The Debtor's failure to pay Rainey the specific, identifiable funds so that she could use such funds for general business needs does not preclude a finding of embezzlement. *See In re Taylor*, 58 B.R. 849, 855–856 (Bankr.E.D.Va.1986); *In re Shuler*, 21 B.R. 643, 644 (Bankr.D.Idaho 1982);. In fact, the transfer of the risk of loss from herself to Rainey highlights the Debtor's embezzlement. *See In re Taylor*, 58 B.R. at 856.

The Debtor has not provided this Court with an adequate explanation of why she did not pay Rainey his fees when she had the means to do so. Under the facts in the proceeding at bar, it is clear that in not paying Rainey, the Debtor embezzled funds rightly belonging to Rainey under § 523(a)(4). Consequently, Rainey's claim is not dischargeable under § 523(a)(4).

### 3. Did the Debtor commit willful and malicious injury to Rainey?

■ Alternatively and cumulatively, Rainey argues that his claim is not dischargeable under Bankruptcy Code § 523(a)(6), which provides that a debtor may not be discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." [47] In 1998, the United States Supreme Court held that in (a)(6), the word "willful" modifies the word "injury" and thereby causes dischargeability to require a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (emphasis in original). This is akin to an intentional tort whereby the actor must intend the consequences of the act and not simply the act itself. *Id.* at 61–62, 118 S.Ct. 974 (citing Restatement (Second) of Torts § 8A, cmt. a (1964)).

■ Following *Kawaauhau*, the Fifth Circuit has determined that the test for "willful and malicious" should be a single inquiry entailing a two-pronged test. *Miller*, 156 F.3d at 603. That is, "willful and malicious" injury occurs where there is either: (1) an objective substantial certainty of harm; or (2) a subjective motive to cause harm. *Id.* at 606. Under the subjective test, the court would need to find that "the debtor must have intended the actual injury that resulted." *Texas v. Walker*, 142 F.3d 813, 823 (5th Cir.1998) (citing *In re Delaney*, 97 F.3d 800, 802 (5th Cir.1996)). As the Fifth Circuit has so pointedly noted, debtors generally deny an intent to cause harm. [48] *In re Red*, 96 Fed.Appx. 229 (5th Cir.2004). Consequently, most decisions which do find willful and malicious injury find debts to be nondischargeable under the objective standard. *Id.* The objective standard is met when the court holds that the debtor "intentionally took action that necessarily caused, or was substantially certain to cause, the injury." *In re Williams*, 337 F.3d 504, 509 (5th Cir.2003) (quoting *Walker*, 142 F.3d at 823 and *Delaney*, 97 F.3d at 802).

■ It was the Debtor's failure to pay to Rainey all of his proportionate share of fees received from the Brio/DOP Litigation that gave rise to Rainey's claim. Rainey argues that it was this conduct which was willful and malicious under

---

47. 11 U.S.C. § 101(15) defines "entity" to include a person. Because Rainey is a person, he fits within the term "entity" as that term is used under 11 U.S.C. § 523(a)(6).

48. The Debtor did so at trial. [Transcript D3, p. 6, line 11 through p. 7, line 18; Transcript D3, p. 203, lines 6–9; Transcript D3, p. 209, lines 14–15; Transcript D6, p. 267, line 20 through p. 26, line 3; Transcript D6, p. 280, lines 23–24].

§ 523(a)(6). Certainly, the Debtor's non-payment was egregious. In fact, as discussed *infra*, these acts constitute embezzlement. Yet, the Fifth Circuit has specifically found that under § 523(a)(6), actions which constituted embezzlement *per se* still need to be analyzed to determine the Debtor's intent or whether there had been an objective substantial certainty of harm. *Miller*, 156 F.3d at 606.[49] Likewise, although the Debtor's nonpayment can also be classified as the tort of conversion,[50] that alone is not enough to bring the actions under § 523(a)(6). In analyzing § 523(a)(6), the Fifth Circuit cautions that "[m]erely because a tort is classified as intentional does not mean that any injury caused by the tort feasor is willful." *Miller*, 156 F.3d at 604. Similarly, the United States Supreme Court has noted that a knowing breach of contract does not necessarily result in intentional injury. *Kawaauhau*, 523 U.S. at 62, 118 S.Ct. 974. Instead, whether viewing the Debtor's actions as a breach of contract, an embezzlement (a crime), or a conversion (a tort), the dischargeability of her debt to Rainey depends upon the intentional or certain nature of her actions.

It is manifest from the record that the Debtor failed to pay Rainey not because she did not actually receive funds from the Brio/DOP Litigation, but because she used such monies for other purposes. The Debtor testified that although some uses included law firm expenses directly related to the Brio/DOP Litigation, some of the monies were used for general on-going law firm expenses. [FOF No. 38]. Indeed, the Debtor further testified that she would deposit fees from the Brio/DOP Litigation into the law firm's operating account [FOF No. 29], out of which she would pay not only firm expenses but also personal expenses, including her mortgage and automobile payments. [FOF Nos. 38 and 39]. Although Rainey repeatedly asked the Debtor for an accounting of fees received from the Brio/DOP Litigation as well as related expenses, at no time did the Debtor provide him with one. [FOF No. 42]. In lieu of an explanation of the amount of monies received and on what they were expended, the Debtor wrote at least two letters to Rainey in which she laboriously tried to rationalize why she was not paying Rainey his agreed upon percentage of the Brio/DOP Litigation fees. In these letters, the Debtor turns around the argument and tells Rainey that it is *he*, not she, who is attempting to modify their arrangement. [FOF Nos. 40 and 41]. Fourteen months after executing the Agreement, the Debtor's apparent non-payment, failure to produce an accounting, and lack of communication had become so flagrant that Rainey sent a letter to Williams asserting a claim to his portion of such litigation fees that Williams might still have under his control. [FOF No. 43]. One month later, Rainey filed the 1998 Lawsuit against the Debtor in state court. [FOF No. 44].

---

49. Although the Fifth Circuit made this finding with respect to embezzlement in 1998, the court crystalized the point with respect to larceny in 2003. *In re Williams*, 337 F.3d 504, 510 (5th Cir.2003).

50. Conversion occurs upon the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another person to the exclusion of, or inconsistent with, the owner's rights. *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex.1971); *W.E. Stephens Mfg. Co. v. Goldberg*, No. 08–04–00232–CV, 2005 WL 2044858, 2005 Tex, App. LEXIS 7039 (Tex. App.-El Paso, Aug. 25, 2005 pet. filed). When the Debtor received monies from the Brio/DOP Litigation and used some of Rainey's portion for her own purposes, she was exercising control over his property inconsistent with his rights and excluding him from so using such property; that is, she "converted" his property.

As the trier of fact, this Court finds that by using Brio/DOP Litigation fees to pay her own expenses and not pay Rainey his full share of the monies, the Debtor's actions were intended to injure Rainey. Under the "objective" *Miller* test, the Debtor's actions were substantially certain to, and did, cause Rainey harm. This Court finds it inconceivable that any objective observer would think otherwise. Thus, the Debtor's non-payment of Rainey's share of the Brio/DOP fees meets the seminal *Kawaauhau* test of a "deliberate or intentional injury." Under these circumstances, this Court finds that the Debtor's actions caused a "willful and malicious injury" to Rainey under § 523(a)(6) and, hence, his claim is not dischargeable.

### F. Are any of the affirmative defenses asserted by the Debtor meritorious?

In her Original Answer to Rainey's Complaint to Determine Dischargeability of Debt, Counterclaim and Request for Jury Trial (the Answer) (Docket No. 25), the Debtor raises seven affirmative defenses.

#### 1. Duress

In ¶ 43 of the Answer, the Debtor alleges that Rainey induced her to modify their original oral agreement and execute the Agreement by subjecting her to "extreme duress." Texas law has been clear for the past eighty years that economic duress only occurs if the following elements are present: (1) a party threatens action, or commits an act, without legal right to do so; (2) the threat or action was of such a character as to destroy the other party's free agency; (3) the threat or action overcame the other party's free will and caused her to do that which she would not otherwise do and was not legally bound to do; (4) the restraint caused by such threat was imminent; and (5) the other party had no present means of protection. *Sudan v. Sudan*, 145 S.W.3d 280, 286 (Tex. App.-Houston [14th Dist.] 2004, no pet. h.); *Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 443 (Tex. App.-Houston [14th Dist.] 2000, pet. den.); see *Dale v. Simon*, 267 S.W. 467, 470 (Tex. 1924).

The foundational requirement for economic duress is a threat, or act, by the opposing party without legal right. The Debtor has neither alleged nor proven that Rainey threatened her under these conditions. Even if this Court were to accept the Debtor's testimony as entirely true—that Rainey hounded her to sign the Agreement—Rainey was well within his rights to make this request.[51] In addition, the Debtor never complained of duress until Rainey attempted to collect on the Agreement in this Court. "A party cannot sit idly by and receive benefits under a contract and then later raise claims of economic distress." *Hotel Employees & Rest. Employees Union v. Sage Hospitality Res., L.L.C.*, 299 F.Supp.2d, 461, 466 (W.D.Pa.2003) (citing *Seal v. Riverside Federal Savings Bank*, 825 F.Supp. 686 (E.D.Pa.1993)). The Debtor's silence, in effect, ratified the Agreement. *Id.* at 466. Accordingly, this Court finds that duress is not a defense to the Debtor's voluntary

---

**51.** The Debtor's testimony was that Rainey came over to her house at 11:30 p.m. at night and told her that he would leave the Davenport Law Firm unless she signed the Agreement. [Transcript D1, p. 42, lines 18–21]. Rainey's recollection was that the Agreement was signed at the Debtor's law firm. Regard-less of when and where the Debtor signed the Agreement, the fact is that she signed the Agreement and knew full well what she was signing. That Rainey threatened to leave the firm if she refused to sign the Agreement does not make the Agreement unenforceable.

execution of the Agreement, which underpins the Judgment and Rainey's claim.

## 2. Failure of consideration

■ In ¶ 44 of the Answer, the Debtor alleges that Rainey did not provide consideration, presumably for their original oral agreement as later reflected in the Agreement. Rainey was the Debtor's employee, and the Agreement explicitly states that the assignment of 15% of the Brio/DOP Litigation was a condition of his employment with her firm. [FOF Nos. 8 and 20]. This assignment represented compensation for the work he performed while in her employ. Rainey was employed by the Debtor for approximately four years, from October of 1993 until September 15, 1997. This Court finds that four years of work is sufficient consideration for whatever amount of money the Debtor was willing to pay at the time she agreed to the compensation.

■ The Debtor apparently has concluded that she made a bad bargain with Rainey and does not want to comply with either the Agreement, the Mediation Settlement Agreement, the $150,000.00 promissory note, or the resulting Judgment. However, it is not the province of this Court to relieve her of a bad bargain, no matter how harsh. *Wooten Prop., Inc. v. Smith,* 368 S.W.2d 707, 709 (Tex. Civ. App.-El Paso 1963, writ ref'd); *River Birch, Inc. v. Robin & Assocs., Inc.,* 906 So.2d 729, 737 (La. Ct.App. 1 Cir.2005). Her later assertions that Rainey did not deserve the compensation to which she agreed does not relieve the Debtor of her obligation to him.

## 3. Payment

■ In ¶ 45 of the Answer, the Debtor states that she has paid all or part of monies owed to Rainey under "their agreement." The Debtor paid Rainey a total of $400,00.00 in 1997 under the Agreement. [FOF Nos. 26, 28 and 31]. Despite paying him $400,000.00, the Debtor still owed Rainey the sum of $157,620.82 under the Agreement. [FOF No. 97]. Thereafter, as a result of the mediation, the Debtor and Rainey entered into the Mediation Settlement Agreement. [FOF No. 49]; and as required by this document, the Debtor executed a promissory note for $150,000.00, bearing interest at 15% per annum, to be repaid in sixty consecutive monthly installments of $3,160.73, beginning on August 1, 2000. [FOF No. 50]. Thus, the $157,620.80 obligation owed by the Debtor to Rainey under the Agreement was converted into a promissory note obligation of $150,000.00. Thereafter, the Debtor made thirteen consecutive monthly payments of $3,160.73, but then failed to make further payments. [FOF No. 55]. The Debtor's thirteen payments constitute payment, and therefore the Debtor's affirmative defense is meritorious to the extent—and only to this extent—that those thirteen payments were made pursuant to the note. Beyond that, this particular affirmative defense fails.

## 4. Accord and satisfaction

■ In ¶ 46 of the Answer, the Debtor raises a defense of accord and satisfaction. The Debtor has failed to show that Rainey has entered into an agreement with her to accept an amount less than that required by the Mediation Settlement Agreement, the $150,000.00 note, the Judgment or his proof of claim. Consequently, accord and satisfaction is not a meritorious defense.

## 5. Contributory negligence, failure to mitigate damage, and sole proximate cause

■ In ¶ 47 of the Answer, the Debtor states that after Rainey left her employ, she asked him to pursue work on the

Davenport/Brio Litigation, and he refused to do so. The Debtor alleges that Rainey's refusal to work on such litigation operated as contributory negligence resulting in the Debtor's withdrawal and failure to receive additional fees from the Davenport/Brio Litigation. The Debtor further alleges that Rainey's refusal to resume work on the Davenport/Brio Litigation was a failure to mitigate damages and/or was the sole proximate cause of $150,000.00, plus interest and attorney's fees, of damages alleged by Rainey.

■■■ While it may be correct that the Debtor might not have withdrawn from the Davenport/Brio Litigation and might have received additional fees therefrom had Rainey resumed work on such litigation, it is of no significance to this proceeding. Rainey had no duty to resume work on the Davenport/Brio Litigation. "[A] discharged employee need not accept an offer of re-employment where to do so would constitute a disadvantageous renegotiation of his rights and remedies thereunder." *Piutau v. Fed. Express Corp.,* 2003 WL 1936125, at *2 (N.D.Cal.2003) (quoting *Schwarze v. Solo Cup Co.,* 112 Ill.App.3d 632, 68 Ill.Dec. 228, 445 N.E.2d 872 (1983)). The Debtor's obligation under the Agreement was to pay Rainey 15% of net fees received from those suits in the Brio/DOP Litigation that generated payments to the Davenport Law Firm. This obligation was reduced to a sum certain by the Mediation Agreement, the $150,000.00 note, and again by the Judgment. Rainey's claim reflects the award from the Judgment. Consequently, these affirmative defenses are not viable.

### 6. Offset

In ¶ 48 of the Answer, the Debtor proposes that if it is determined that Rainey, not the Debtor, referred Brio/DOP cases to the firm of Reich & Binstock, then any recovery by Rainey in this proceeding should be offset by any payment Rainey receives from Reich & Binstock from such cases. The representation of any litigant by Reich & Binstock has not been otherwise addressed by the Debtor and is irrelevant to this proceeding.

### 7. Lack of ripeness

■■■ In ¶ 49 of the Answer, the Debtor states that Rainey seeks to recover under the original oral agreement and/or the Agreement. The Debtor argues that the Brio/DOP Litigation has not yet been concluded and that total gross recovery from such litigation, related direct expenses and, hence, net recovery is unknown. Under this argument, according to the Debtor, the amount due Rainey is undetermined at this time.

The Debtor is incorrect: Rainey does not directly seek recovery based on their original oral agreement, the Agreement, the Mediation Settlement Agreement or the $150,000.00 note. Instead, Rainey's claim is based on the Judgment, which is res judicata;[52] and the issue at bar is the nondischargeability of this claim. The dischargeability of Rainey's claim is, of course, perfectly ripe for consideration at this time and by this Court.

In the alternative, were this Court to consider the Debtor's argument on its face, this Court would nonetheless find it specious. In the Answer, the Debtor asserts that according to the original agreement, "all offsets for expenses are made before a final accounting is done and monies are due to be paid to Plaintiff [Rainey]."[53] The Debtor's prior actions belie this assertion. The Debtor had used Brio/DOP Liti-

---

**52.** See discussion at ¶ **C**, above.

**53.** The Answer, ¶ 49.

gation fees for both personal expenses and general expenses of her law firm; she has paid Rainey some portion of the fees due to him; and yet, she has provided no complete and accurate accounting of revenues and expenses related to this litigation. It is difficult for this Court to find that the Debtor has ever actually believed her own assertion, much less that the Debtor intended to act on it. Even if the Debtor had such a belief, she is equitably estopped from asserting this affirmative defense. *Maguire Oil Co.*, 69 S.W.3d at 367; *Corman*, 796 S.W.2d at 792. Consequently, this defense to Rainey's claim is without merit.

## VI. CONCLUSION

Sir Walter Scott, the Scottish author and novelist, once wrote: "Oh what a tangled web we weave, when first we practise to deceive!" [54] His observation aptly describes the Debtor in this adversary proceeding. She persuaded Rainey to come work at her firm by orally promising to pay him a percentage of net fees generated from certain litigation. Yet, she did not pay him a dime when O'Quinn paid her $162,514.03 in the wake of the settlement proceeds paid in the O'Quinn/Brio Litigation. [FOF No. 15]. Nor did she disclose to Rainey that O'Quinn, before remitting any monies to the Debtor's firm, deducted several hundred thousand dollars for obligations that the Debtor personally owed to O'Quinn on a loan that O'Quinn had extended to the Debtor for the purchase of, among other things, a home on Sunset Blvd. in Houston. [FOF No. 15]. Then the Debtor, in an effort to keep Rainey at her firm, executed the Agreement in November of 1996, promising in writing to pay Rainey 15% of net fees received by the Davenport Law Firm. Yet, when the Williams/Brio Litigation was settled, Williams paid the Davenport Law Firm $2,745,447.39 in September of 1997 rather than the $3,645,872.00 that should have been paid based upon the disbursement sheet that Williams sent to the Debtor. [FOF Nos. 25, 29 and 30]. [55] The Debtor never explained to Rainey why Williams failed to pay $3,645,812.00 as opposed to $2,745,447.39, nor did she ever provide an accounting to Rainey regarding the $932,177.10 of expenses deducted for the Williams/Brio Litigation. Indeed, the Debtor never disclosed to Rainey that Williams paid her firm another $469,619.28 on July 30, 1998, 15% of which Rainey was entitled. [56] Is it any wonder that Rainey sued the Debtor in the 1998 Lawsuit, and then sued her again in the 2001 Lawsuit when she defaulted under the promissory note and Mediation Settlement Agreement?

But the Debtor's pattern of deception did not stop with her conduct toward Rainey. She continued her attempts to deceive through her litigation strategy in this Court. She attempted to convince this Court that her position from the very outset has been that Rainey was not entitled

54. Sir Walter Scott, *Marmion, Canto vi. Stanza 17*. The Court notes that the word "practise" is not misspelled in this quotation.

55. The disbursement sheet shows that the gross fee allocation for the Davenport Law Firm was $4,577,929.04 and that the expense allocation for the Debtor's firm was $932,117.10. Subtracting $932,117.10 from $4,577,929.04 results in a net fee figure of $3,645,811.94.

56. Williams therefore paid a total of $3,215,066.00 (i.e., $2,745,447.00 plus $469,619.00) to the Debtor. Given that the disbursement sheet shows that the Debtor's firm had gross fees in the amount of $4,577,929.04, and expenses in the amount of $932,117.10, the net fees that Williams should have paid to the Debtor's firm was $3,645,811.94, and the Debtor has failed to account for the difference of $430,745.94.

to receive a penny until (a) every suit comprising the Brio/DOP Litigation was over; (b) all expenses relating to all of these suits were deducted from all fees paid; and (c) a surplus existed after all of these expenses were deducted. The Debtor took this position despite:

—Never telling Rainey in 1996 that this was her interpretation of their oral arrangement.

—Never telling Rainey in 1997 that this was her interpretation of the Agreement.

—Spending the fees herself as soon as they were remitted to the Davenport Law Firm from settlements in any of the suits, with the expenditures being on her personal items as well as general overhead at her firm.

—Making three payments to Rainey in September of 1997 totaling $400,000.00 after Williams paid a substantial portion of the Davenport Law Firm's share of the fees.

—Telling Rainey in 1998 that "you have made a sizeable and by most people's standards 'great' profit on top of a healthy salary. On the other hand, I have and will continue to absorb a stagging (sp) loss. *In view of these facts my feeling again is that we are more than right with each other.*" (emphasis added).

—Never objecting to Rainey's proof of claim.

The Debtor's actions and words in 1996, and thereafter, reveal why the Debtor failed to pay Rainey all that he was entitled. She was dissatisfied with the results of the Brio/DOP Litigation and she wanted to spend the fees that were paid on personal expenses and her firm's overheard

rather than fulfill her obligation to Rainey. Indeed, the Debtor's actions are understandable—however inappropriate—when one focuses on the fact *that during this period of time, the Debtor had personal expenses of between $27,000.00–$30,000.00 per month, including a monthly house payment of approximately $5,000.00.* [FOF No. 39]. Unfortunately for the Debtor, her justification as to why she did nothing wrong—namely, that Rainey is not entitled to a dime until all the Brio/DOP Litigation is over—cannot withstand scrutiny.

Nor was the Debtor's attempt to create a new interpretation of the Agreement her only unsavory tactic at trial. Although she never once criticized Rainey for his work during his entire four year tenure at her firm, and although she made concerted efforts to convince him to stay at her firm—not the least of which was her execution of the Agreement in November of 1996—and although she made several attempts to persuade him to continue working on the Davenport/Brio Litigation after his departure from her firm, she nevertheless testified repeatedly at trial what a miserable attorney Rainey was when he worked at her firm.[57] This Court believes that the Debtor took this approach at trial in an effort to prejudice this Court towards Rainey so that it would conclude either that Rainey had no claim or, even if he did, the claim was dischargeable. The Debtor's tactics will not work. The Debtor's affirmative defense of contributory negligence on Rainey's part—namely, that his failure to continue to work on the Davenport/Brio Litigation led to no fees being received from those lawsuits—reflects that, in fact, the Debtor believed that Rainey was a competent attorney, at least

---

**57.** Attached as **Appendix C** are some of the comments that the Debtor made at trial about

Rainey's incompetence.

when she filed her answer and affirmative defenses to the complaint in this adversary proceeding. The Debtor speaks out of both sides of her mouth. Accordingly, this Court sees only one side of the Debtor: one of deceit.

At trial, the Debtor testified that "You know, I'm probably one of the most ethical lawyers you'll ever meet." [Transcript D1, p. 241, lines 3–5]. Based upon the Debtor's testimony and the exhibits introduced at trial, this Court disagrees and finds that the Debtor's unethical conduct has made Rainey's claim against her to be nondischargeable.

█ For the reasons set forth above, this Court holds that:

(1) Rainey's claim against the Debtor totals $171,807.35, plus accrued interest at the rate of 18% per annum as set forth in the Judgment, which began accruing on June 2, 2003, the date the Debtor filed her Chapter 11 petition, and will continue to accrue until the Judgment is paid in full.[58]

(2) This claim is nondischargeable under 11 U.S.C. § 523(a)(4) because the Debtor embezzled the funds that she should have paid to Rainey;

(3) In the alternative, even if this Court is incorrect that the Debtor embezzled the funds, the Debtor's spending the funds constitutes a willful and malicious injury by the Debtor to Rainey under 11 U.S.C.

§ 523(a)(6), thereby making Rainey's claim nondischargeable; and

(4) Each party is to bear his or her own fees and costs for the prosecution and defense of this adversary proceeding. This Court takes no position as to the propriety of Rainey seeking recovery of the fees and expenses that he has incurred in the event the Debtor appeals this Court's judgment.

A separate Judgment consistent with this Memorandum Opinion will be issued and docketed simultaneously with the entry of this Judgment on the docket.

█

**58.** Post-petition interest on a debt not discharged in bankruptcy under Bankruptcy Code § 523(a) is both allowable and appropriate and will survive the bankruptcy and remain a personal liability of the Debtor. *Bruning v. United States,* 376 U.S. 358, 84 S.Ct. 906, 11 L.Ed.2d 772 (1964) (post-petition interest permitted on a nondischargeable tax debt); *In re Hanna,* 872 F.2d 829 (8th Cir. 1989); *In re Hunter,* 771 F.2d 1126, 1132 (8th Cir.1985) ("Ancillary obligations such as attorneys' fees and interest may attach to the primary debt; consequently, their status depends on that of the primary debt."); *In re Oxford Inv. Co.,* 246 F.Supp. 651 (S.D.Cal. 1965); *In re Florida v. Ticor,* 164 B.R. 636 (9th Cir. BAP 1994); *In re Levinson,* 58 B.R. 831 (Bankr.N.D.Ill.1986) (claimant is entitled to post-petition interest on debt found to be nondischargeable under § 523) *aff'd Klingman v. Levinson,* 66 B.R. 548 (N.D.Ill.1986), *Klingman v. Levinson,* 831 F.2d 1292 (7th Cir.1987) and *Klingman v. Levinson,* 877 F.2d 1357 (7th Cir.1989).